DAYTON MONETARY ASSOCIATES et al., Appellees,

v.

BECKER et al., Appellants.

[Cite as *Dayton Monetary Assoc. v. Becker* (1998), 126 Ohio App.3d 527.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 16766.

Decided March 6, 1998.

See also, 105 Ohio App.3d 559, 664 N.E.2d 954.

528

*John T. Ducker,* for appellees.

*Jack Gallon* and *Robert W. Fiedler, Jr.,* for appellants.

---

BROGAN, Judge.

This case might best be described as "The Never-Ending Story," since the current appeal is the third time these plaintiffs and defendants have knocked heads in the court of appeals over the defendants' obligation to pay certain capital calls. In both prior appeals, defendants won the round on technicalities. First, in *Dayton Securities Assoc. v. Avutu* (1995), 105 Ohio App.3d 559, 664 N.E.2d 954, we decided that the judgment against defendants could not stand because the plaintiffs had failed to file partnership certificates with the county recorder as required by R.C. 1777.02. As a result, we held that R.C. 1777.04 presented a statutory bar to any action by the partnerships until the certificates were filed. We did expressly note that plaintiffs could file another action without fearing the application of *res judicata.*

Consistent with our opinion, plaintiffs registered partnership certificates with the county recorder and then filed two more actions on March 3, 1996, one naming Dayton Monetary Associates ("DMA") as plaintiff, and the other naming Dayton Securities Associates ("DSA") as plaintiff. Both DMA and DSA are general partnerships. According to the affidavit of Allan Rinzler, the managing partner of DMA and DSA, DMA was organized as a partnership in 1979 for the purpose of purchasing and owning securities and other investments, including limited partnership units in a New York limited partnership called The Monetary Group ("TMG"). Because TMG proved successful in passing large tax losses to its limited partners, a second limited partnership, The Securities Group ("TSG 80"), was formed. Many of the people who had invested in DMA were eager to stay on the tax-loss bandwagon, and thus formed DSA for the purpose of investing in TSG 80. An interesting feature of both DMA and DSA was that each general partner agreed to be liable for up to three times the original cash contribution to pay recourse debts of the limited partnerships, *i.e.,* the debts of TMG and TSG 80. These agreements, in turn, allowed the DMA and DSA partners to claim tax losses of $4 for every dollar invested.

Unfortunately for the partners in DMA and DSA, TSG 80 and TMG filed for bankruptcy protection in 1984. Charles Atkins, who had formed TMG, TSG 80, and other partnerships, was also convicted of fraud because the trading activities of TMG and TSG 80 were found to be rigged, no-risk transactions, with the sole purpose of creating tax losses. Not surprisingly, the Internal Revenue Service then acted to disallow some of the tax deductions taken by the DMA and DSA

partners. Additionally, the Chapter 11 trustee brought suit against DMA and DSA to obtain payment of the recourse obligations of TMG and TSG 80. Eventually, judgment in the bankruptcy proceeding was rendered against the partnerships jointly and severally to the tune of approximately $18,000,000, plus interest. DMA and DSA were not the only defendants in the bankruptcy proceeding; judgment was also awarded against many other TMG and TSG 80 investors, in varying amounts.

As a result of the bankruptcy proceedings, DSA and DMA issued capital calls to pay legal fees and to pay a bond pending appeal of the bankruptcy judgment. While the great majority of partners paid the capital calls, the defendants failed to pay. As was mentioned above, we dismissed the original suits against these partners in 1995, because partnership certificates had not been filed. After DMA and DSA brought new suits against the defaulting partners in 1996, the cases were eventually consolidated. In the meantime, a group of defendants represented in both actions by co-defendant, Jack Gallon, filed motions to dismiss, claiming that the present actions were barred under the doctrine of *res judicata*. Shortly after, the same defendants asked the court to defer ruling on their motions to dismiss until after summary judgment proceedings were resolved. Both sides then filed motions for summary judgment. Notably, in responding to plaintiffs' motion and in advocating their own right to summary judgment, defendants did not dispute the factual basis presented by plaintiffs for summary judgment or the amounts due on the capital calls. Instead, they again focused on whether registration of the partnership certificates was proper. In particular, defendants attacked the fact that when the certificates were filed, the managing partner signed on behalf of all the partners and did not obtain individual signatures for the certificates.

Once again, the trial court found in plaintiffs' favor, and defendants appealed. This time, we dismissed the appeal for lack of a final, appealable order. Specifically, claims against at least one defendant remained unresolved and the trial court had not made a Civ. R. 54(B) finding. See *Dayton Securities Assoc. v. Becker* (Apr. 11, 1997), Montgomery App. No. 16240, unreported, 1997 WL 205997.

After remand, a judgment order was filed on April 30, 1997, awarding judgment against the defendants in the same amounts as had been granted before appeal, but this time, Civ. R. 54(B) language was included. However, no immediate appeal was taken from the judgment order. Instead, on the same day the order was issued, the defendants filed a memorandum contending that the amounts of the appeal bond capital calls should be excluded from the order. In this regard, defendants claimed that the parties had agreed during the previous litigation that defendants would not be required to pay the appeal bond capital

calls for the litigation in bankruptcy court until those proceedings were final and the proportionate amounts due were calculated. In support of this claim, defendants indicated that they were attaching portions of a transcript from the previous litigation, which purportedly showed the existence of such an agreement. However, no transcript was attached to the memorandum.

Subsequently, plaintiffs filed two memoranda in June and July 1997, responding to the points in the defendants' April memorandum. Specifically, plaintiffs objected because defendants had not properly raised settlement as a defense. Defendants made no response to this argument, nor did they ask to amend their answers.

Next, on August 5, 1997, the trial court vacated the judgment filed on April 30, 1997, due to the fact that the April entry had been inadvertently filed. In the August entry, the court also said it had reviewed proposed judgment entries and memoranda from both parties, and had found plaintiffs' proposal to be correct. Accordingly, the court once more entered judgment for plaintiffs for the amount of the capital calls for both legal and bond expenses, with interest from December 1, 1996. Once again, Civ.R. 54(B) language was inserted in the judgment entry. Defendants then appealed, raising the following assignments of error:

"I. Defendant-Appellants in this matter (hereinafter referred to as Defendants) assign as error the Trial Court's refusal to bar Plaintiff–Appellees' (hereinafter referred to as Plaintiffs) recovery due to their non-compliance with Ohio Revised Code Section 1777.02.

"II. Defendants in this matter assign as error the Trial Court's denial of Defendants' Proposed Judgment Order filed on May 23, 1997.

"III. Defendants in this matter assign as error the Trial Court's failure to rule on and grant defendants' Motions to dismiss."

Upon consideration of the defendants' assignments of error, we find them without merit and affirm the judgment of the trial court. Our reasons for doing so are set forth below.

## I

In support of their claim that plaintiffs failed to comply with R.C. 1777.02, defendants make three primary arguments. Taking these arguments in logical but reverse order, defendants contend that R.C. 1777.02 does not allow general powers of attorney to be used to substitute for partners' signatures on a certificate of registration. Further, defendants claim that even if a power of attorney can be used, the managing partner who signed the certificates did not have powers of attorney from all the partners because some of the partners were deceased. Finally, defendants maintain that they revoked the power of attorney

when the summons and complaints in the previous actions were served on them. Although defendants point to no express revocation, they allege that the adversarial nature of the prior lawsuits automatically created a conflict between their interests and those of the managing partner who was serving as their agent.

R.C. 1777.02 requires that if a partnership is doing business under a fictitious name or under a designation not showing the partners' names, a certificate must be filed with the county recorder where the partnership's principal place of business is located. The certificate must contain the names and places of residence of the partners. Additionally, R.C. 1777.02 provides that "[t]he certificate shall be signed by the partners and acknowledged by some officer authorized to take acknowledgments of deeds."

If the requirements of R.C. 1777.02 are not met, R.C. 1777.04 prohibits suit by the partnership. Specifically, R.C. 1777.04 states as follows:

"No persons doing business as partners contrary to sections 1777.02, 1777.03, and 1777.05 of the Revised Code shall commence or maintain an action on or on account of any contracts made or transactions had in their partnership name in any court of this state until they first file the certificate required by such sections; but if such partners at any time comply with such sections, then they may commence an action, or if one has been commenced they may maintain it, on any such partnership contracts and transactions entered into prior to as well as after such compliance. If any member of a partnership dies before such certificate is filed, the surviving partners may file such certificate, and it shall have the same effect as if it had been filed by the members of said partnership before the death of said partner."

As a preliminary matter, we note that R.C. 1777.02 is silent concerning whether a power of attorney can be used to satisfy the signature requirement. Our belief, however, is that the statute must be interpreted in light of the purpose of the fictitious-name statute as well as the widespread use of powers of attorney in situations where obtaining an individual's personal signature would be impractical or cumbersome. See, e.g., State ex rel. Munici v. Kovacic (June 15, 1994), Cuyahoga App. No. 64818, unreported, 1994 WL 264265 (designee with power of attorney allowed to pursue prisoner's public records request), and Henry v. BancOhio Natl. Bank of Columbus (1991), 74 Ohio App.3d 209, 598 N.E.2d 766 (power of attorney used to sign mortgage on behalf of mortgagor). Such a situation is presented by the current cases, which involve partnerships with hundreds of partners located in many states. Under the circumstances, requiring personal signatures from each partner and filing voluminous individually signed documents with the county recorder is incompatible with the purpose of the fictitious-name statute. The intent of such statutes is simply to "afford the public information as to the identity of persons conducting the business, to

prevent deception and confusion." *Reed v. Pelley* (1982), 112 Misc.2d 382, 447 N.Y.S.2d 98, 99. In this context, we are unable to find any logical relationship between the personal signature of a partner on a piece of paper and the informational purpose of the statute. Rather, the informational purpose is fully satisfied by supplying the partners' signatures, names, and addresses via a power of attorney, as was done in this case.

█ Furthermore, because the fictitious-name statute is in derogation of the common law, we are required to strictly construe the statute. See *Burton v. DePew* (1988), 47 Ohio App.3d 107, 108–109, 547 N.E.2d 995, 995–996, and *LaCourse v. Fleitz* (1986), 28 Ohio St.3d 209, 212, 28 OBR 294, 297, 503 N.E.2d 159, 161–162. Ohio's present fictitious-name statute has remained essentially unchanged since the original version was enacted in 1894. Compare current R.C. 1777.04 with section 6 of the 1894 Act to "prohibit the use of fictitious names in partnership," as described in *Cobble v. Farmers' Bank* (1900), 63 Ohio St. 528, 536, 59 N.E. 221, 221–222. A very early interpretation of the 1894 Act mentioned that the right to sue as a partnership existed under the common-law. *Hartzell & Co. v. Warren* (1896), 5 Ohio C.D. 183. In *Hartzell,* the Act was classified as a disabling or partially disabling statute because it infringed upon this common-law right. Likewise, in *Calvert v. Newberger & Bro.* (1897), 11 Ohio C.D. 184, affirmed (1900), 61 Ohio St. 660, 57 N.E. 1131, the Act was narrowly construed as an exception to the general policy that partnerships have a broad, unlimited right to sue in the partnership name. Furthermore, in *K.B. Co. v. Batie* (1903), 15 Ohio C.D. 482, the court held that the 1894 Act was penal in nature and should be strictly construed.

In view of the purpose of the fictitious-name statute and the requirement of strict construction, we choose not to engraft any further prohibition onto R.C. 1777.02 and 1777.04 than already exists. Although R.C. 1777.02 does say that the certificate shall be signed by the partners, it does not forbid the use of powers of attorney to substitute for a personal signature. Therefore, we find no fault with the fact that Allan Rinzler, as attorney-in-fact, signed for the rest of the partners. Our conclusion is also buttressed by the fact that R.C. 1777.04 allows surviving partners to file partnership certificates on behalf of deceased partners. Because "personal" signatures would be impossible to obtain in such cases, the legislature was clearly aware that substitutes for signatures might be employed.

█ Concerning the powers of attorney given to Rinzler by the partners in the Subscription Agreement, the powers unquestionably authorized Rinzler to sign and file partnership certificates. In this regard, we note that powers of attorney can be general or specific and can be either limited or unlimited. *Layet v. Gano* (1848), 17 Ohio 466, 1848 WL 129. The powers of attorney signed by the defendants were general and unlimited, in that Rinzler was authorized to take

numerous actions on behalf of the partners, but was not confined to any specific methods. Additionally, Rinzler was given express authority to execute "such documents and certificates * * * in order that * * * [the partners] and the Partnership obtain the benefits of the Partnership Laws of Ohio." Therefore, we conclude that Rinzler had the power, under the Subscription Agreement, and by statute, to sign the partnership certificates on behalf of the DMA and DSA partners.

As was noted above, defendants' second argument is that even if a power of attorney can be used to substitute for the signatures required by R.C. 1777.02, the powers of attorney given to Rinzler lapsed by virtue of the deaths of at least two partners. In response, DMA and DSA contend that the powers of attorney granted to Rinzler were powers coupled with an interest, which survived the partners' deaths. According to the documents filed in connection with summary judgment, two of the DSA partners, Alex Kessler of New York and S.M. Wigser of Cincinnati, Ohio, died before the partnership certificates were filed on January 20, 1995. Kessler died on January 16, 1987, and Wigser died on August 28, 1990. None of the DMA partners is apparently deceased. As a preliminary matter, then, any discussion on this point is irrelevant to the judgment against DMA partners. We also note that judgment was not rendered against either Kessler or Wigser, as claims against both of those defendants were dismissed in 1993, based on the expiration of statutes of limitations pertaining to claims against their estates. See *Dayton Securities Assoc. v. Avutu* (Apr. 28, 1993), Montgomery C.P. No. 92–5089, unreported.

We need not resolve the issue of whether the powers of attorney were coupled with an interest, because the express terms of R.C. 1777.04 give surviving partners the power to act for those who are deceased. Since statutory law existing at the time a contract is made becomes a part of the contract, the provisions of R.C. 1777.04 were incorporated into the Subscription Agreement and allowed Rinzler to sign the partnership certificate on behalf of the deceased partners. See *Holbrook v. Ives* (1886), 44 Ohio St. 516, 524, 9 N.E. 228, 231–232, and *Vannoy v. Capital Lincoln–Mercury Sales, Inc.* (1993), 88 Ohio App.3d 138, 144, 623 N.E.2d 177, 181–182. Therefore, the filing which took place on January 20, 1995, had the same effect as if it had been filed before the death of the partners.

Even if the contents of R.C. 1777.04 were otherwise, and we were required to address the validity of the powers of attorney, we would still find that the powers of attorney effectively survived the death of the two DSA partners. In this regard, we agree with DMA and DSA that the powers given to Rinzler survived as powers coupled with an interest. Rinzler, as general partner of both partnerships, had an interest in the partnership itself, not just in the execution of

the power. See *Swisher v. Orrison Cigar Co.* (1930), 122 Ohio St. 195, 200, 171 N.E. 92, 93–94. See, also, R.C. 1777.23 (outlining property interests of partner in partnership); R.C. 1777.25 (indicating that partnership interest is personal property); and *Lawyers Coop. Publishing Co. v. Muething* (1992), 65 Ohio St.3d 273, 279, 603 N.E.2d 969, 973–974 (comparing interest in law practice to statutorily defined personal property interest in partnership). As a result, whether R.C. 1777.04 is read as part of the contract or whether Rinzler is considered to have had powers coupled with an interest, the powers of attorney survived the death of the two DSA partners.

In a further attempt to show the defectiveness of the partnership certificates, defendants claim that Rinzler was required by R.C. 1777.03 to obtain signatures from new partners to whom the interest of the deceased partners had passed. Because Rinzler did not do so and file a "new" partnership certificate, defendants contend that the present action is barred. Concerning changes in members of partnerships, R.C. 1777.03 provides:

"On every change of the members of a partnership required to file a certificate pursuant to section 1777.02 of the Revised Code, except in the case of a banking partnership established and transacting business outside the United States, a new certificate shall be filed for record with the county recorder as required by section 1777.02 of the Revised Code on the change of members; but in the case of a joint stock company or a banking partnership, it is sufficient if the certificate is filed once in each year, on or before the first Monday in April."

Again, R.C. 1777.04 provides that if a partnership fails to comply with R.C. 1777.03, the partnership may not commence or maintain an action. However, under the circumstances of the present case, we do not believe that R.C. 1777.04 precludes suit by DSA against its partners.

At common law, the death of a partner dissolved the partnership and the continuation of business by the surviving partner and the executor of a deceased partner constituted a new partnership. See, *e.g.*, *McGrath v. Cowen* (1898), 57 Ohio St. 385, 49 N.E. 338. R.C. 1775.30, which is part of the Ohio Uniform Partnership Law, echoes this philosophy by including the death of a partner as a cause for dissolution. However, we have previously held that parties can expressly or impliedly waive provisions in R.C. Chapter 1775, and we conclude that this is what occurred here. See *Estate of Philips v. Daoud* (June 28, 1996), Montgomery App. No. 15816, unreported, 1996 WL 354754. See, also, *Spayd v. Turner, Granzow & Hollenkamp* (1985), 19 Ohio St.3d 55, 59, 19 OBR 54, 57–58, 482 N.E.2d 1232, 1236 (indicating that the partnership agreement is primary and that rights in R.C. Chapter 1775 are subject to the provisions contained in the partnership agreement). In *Spayd,* the Ohio Supreme Court also indicated that courts will not disturb a partnership agreement "in the

absence of extenuating circumstances." *Id.* at 64, 19 OBR at 62, 482 N.E.2d at 1240.

The partnership agreements in this case indicate that the death of a partner does not dissolve the partnership and that the successor in interest retains the deceased partner's partnership interest, succeeding to the decedent's position as a partner. Therefore, based on the content of the partnership agreement, we conclude that no changes in partnership membership occurred as a result of the death of the two DSA partners.

Moreover, while it is true that R.C. 1777.03 indicates that a "new" partnership certificate should be filed when changes to the partnership occur, there is an obvious conflict between that statute and R.C. 1777.04, which authorizes surviving partners to file partnership certificates on behalf of deceased partners, and also gives effect to the certificate as if it had been filed before the death of the partners. In view of the conflict in the statutes, the requirement that these penal statutes be strictly construed, and the fact that the partnership agreement indicates no change in the partnership membership resulting from a member's death, we conclude that DSA did not need to file a new partnership certificate to maintain the present action against DSA partners. We additionally note that defendants did not present evidence that any new partners joined DSA after the partnership certificates were filed in 1995.

■ Defendants' final argument in support of the first assignment of error is that even if powers of attorney can be used to satisfy the requirements of R.C. 1777.02, Rinzler's powers of attorney were revoked upon the filing of the first lawsuits, which were adversarial in nature. As a starting point, we note that the Subscription Agreement does not discuss revocation of the powers of attorney. Further, to the extent that the Subscription Agreement deals with adversarial or potentially adversarial situations, the agreement indicates that the managing partner still has the ability to exercise the powers of attorney. Specifically, the agreement gives the managing partner the power to execute documents needed to conduct business and to effect the dissolution of the partnership. Because dissolution could encompass distinctly adversarial situations, we believe that more is required to discharge the managing partner's powers of attorney than implied revocation. In this context, we note that the record shows no acts of any partner to revoke the powers of attorney, even though approximately six years have passed since the filing of the first lawsuit.

■ In our opinion, however, an even more compelling reason exists for rejecting defendants' argument. Based on the undisputed facts before us, it is obvious that the managing partner acted at the request of the defendants when filing the partnership certificates. After all, the filings were made as a direct

result of the defendants' claim in the previous case that the partnership certificates had not been filed as required. Therefore, in performing the ministerial act of registering the partnership certificates, the managing partner was not acting in an adversarial relationship to the dissenting partners, but was acting in accordance with their express wishes.

Having found no merit in defendants' arguments, the first assignment of error is overruled.

## II

In the second assignment of error, defendants claim that the trial court erred in failing to consider the effect of an alleged settlement entered into during the prior litigation. Specifically, the agreement allegedly was that the amounts owed by defendants would be limited to the appropriate proportionate share of the bankruptcy judgment, as eventually determined in the Florida bankruptcy proceedings. Plaintiffs' response to this argument is that defendants waived the issue of settlement by failing to raise it as an affirmative defense.

We agree with plaintiffs. Settlement is an affirmative defense. *Noroski v. Fallet* (1982), 2 Ohio St.3d 77, 2 OBR 632, 442 N.E.2d 1302. Under established authority, affirmative defenses are waived under Civ.R. 12(H) unless they are presented by motion before pleading, affirmatively in a responsive pleading under Civ.R. 8(C), or through amendment under Civ.R. 15. *State ex rel. Plain Dealer Publishing Co. v. Cleveland* (1996), 75 Ohio St.3d 31, 33, 661 N.E.2d 187, 189–190. However, defendants did not raise settlement in their answers or by motion before answering, nor did they ask permission to amend the pleadings even after plaintiffs raised the fact that a failure to assert settlement as an affirmative defense would result in waiver of the defense. Consequently, defendants waived the issue.

Furthermore, even if this matter had been properly raised, defendants' argument misses the point. At issue in the present litigation are the amounts due *at the time* capital calls were issued for legal fees and for payment of an appeals bond. Plaintiffs have never yet issued a capital call for amounts that might eventually be due after resolution of bankruptcy proceedings. Thus, no factual dispute exists, nor has one ever existed about the amount of the capital calls between 1985 and 1991 for legal fees and to obtain an appeals bond. Not only have these amounts not been disputed in the present litigation, they were also not contested in the previous cases. See *Dayton Securities Assoc., supra,* 105 Ohio App.3d at 566, 664 N.E.2d at 959, in which we commented while discussing prejudgment interest that the "amounts due [on the capital calls] were never in question."

Finally, we note that defendants have tried to supplement the record with materials not before the trial court. As we mentioned above, defendants' May 23, 1997 "Memorandum in Support of defendants' Judgment Order" refers to a transcript from the previous litigation between the parties. However, no such transcript was attached to defendants' memorandum as filed in the trial court. On appeal, defendants' brief includes what purports to be the same transcript, as well as other documents defendants did not even claim to put before the trial court. Such attempts to supplement the record are routinely rejected as inconsistent with "fundamental concepts of appellate practice." *James v. Trumbull Cty. Bd. of Edn.* (1995), 105 Ohio App.3d 392, 399, 663 N.E.2d 1361, 1365. As a result, we refuse to consider materials not presented to the trial court. However, we also emphasize that even if the transcript had been before the trial court, it would have been irrelevant and insufficient to raise issues of material fact about the amounts due on the capital calls.

Based on the preceding discussion, defendants' second assignment of error is overruled.

### III

In the third assignment of error, defendants contend that the trial court erred in failing to rule on pending motions to dismiss. As was previously indicated, the defendants filed motions to dismiss based on the application of *res judicata,* but then asked the trial court to defer a ruling until after both sides filed summary judgment motions. The motions to dismiss were based on the identity of the claims in the present actions to those in *Dayton Securities Assoc., supra,* 105 Ohio App.3d 559, 664 N.E.2d 954. In view of the judgment in their favor in that case, defendants argued that the present actions were barred by *res judicata.*

The trial court did not specifically rule on the motions to dismiss. However, "[w]hen a trial court fails to rule upon a motion, an appellate court generally will presume the trial court overruled the motion." *Akbar-el v. Muhammed* (1995), 105 Ohio App.3d 81, 85, 663 N.E.2d 703, 705, fn. 2. Since the trial court's granted summary judgment to plaintiffs, we presume that the trial court overruled the defendants' motions to dismiss. However, even if the trial court had erred in failing to rule on the pending motions to dismiss, any error was harmless, since the defendants' motions to dismiss were frivolous. When we previously dismissed plaintiffs' action against defendants, we expressly stated that *res judicata* would not apply as a bar to any new actions filed by plaintiffs following registration of partnership certificates. See *Dayton Securities Assoc.,* 105 Ohio App.3d at 565, 664 N.E.2d at 958. Therefore, when defendants filed motions to dismiss based on the *res judicata* effect of our prior judgment, they would have known that their position was without merit. As a result, we would

be hard-pressed to find inconsistency with substantial justice in the trial court's failure to rule on a frivolous motion. Accordingly, because the trial court's error, if any, was harmless, the third assignment of error is overruled.

In light of the preceding discussion, defendants' assignments of error are overruled and the judgment of the trial court is affirmed.

Finally, we note that defendants have filed a motion requesting leave to address an issue raised in oral argument. Specifically, defendants wish to argue that *res judicata* bars any attempt to relitigate the decision in *Dayton Securities v. Avutu.* Since we have not reconsidered our previous decision in *Dayton Securities v. Avutu,* defendants' motion is denied.

*Judgment affirmed.*

WOLFF and FAIN, JJ., concur.