[Cite as *Hornbeck v. Hornbeck*, 2019-Ohio-2035.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY**

JOHN DAVID HORNBECK

    Plaintiff-Appellee

v.

REBECCA SUE HORNBECK

    Defendant-Appellant

:
:
:
:
:
:
:
:
:
:
:

Appellate Case No. 2018-CA-75

Trial Court Case No. 2016-DR-0887

(Appeal from Common Pleas Court-
Domestic Relations Division)

. . . . . . . . . . .

O P I N I O N

Rendered on the 24th day of May, 2019.

. . . . . . . . . . .

JAMES E. HEATH, Atty. Reg. No. 0003757, 20 South Limestone Street, Suite 120, Springfield, Ohio 45502
    Attorney for Plaintiff-Appellee

LINDA JOANNE CUSHMAN, Atty. Reg. No. 0043543, 8 North Limestone Street, Suite E, Springfield, Ohio 45502
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, P.J.

**{¶ 1}** This matter is before the court on the appeal of Rebecca Hornbeck (nka Compton) from a judgment and decree of divorce entered by the trial court.[1] In support of her appeal, Rebecca asserts fourteen assignments of error challenging various aspects of the trial court's decision, including the court's refusal to consider a date prior to the parties' ceremonial marriage for purposes of making an equitable division of property. Rebecca also contends that the trial court abused its discretion in finding that she was voluntarily underemployed and that her husband, John, was not voluntarily underemployed. In addition, Rebecca contends that the trial court abused its discretion in these other ways: failing to find that she had health issues that prevented her from working; failing to equitably divide the equity in the marital real estate; failing to give her distributive awards under R.C. 3105.171(E); failing to award spousal support; failing to require John to pay all or part of her expert fees; failing to require that the parties amend their 2016 and 2017 tax returns to file jointly; and failing to make any finding on her motion for contempt. Finally, Rebecca alleges other ways in which the trial court erred or abused its discretion with respect to discovery, assessing credibility, and factual findings.

**{¶ 2}** For the reasons discussed below, the judgment will be reversed in part and affirmed in part, and will be remanded to the trial court for further proceedings consistent with this opinion.

## I. Facts and Course of Proceedings

**{¶ 3}** John and Rebecca began living together in May 2000 and subsequently married on April 12, 2003. They did not have any children together, but from around

---

[1] For clarity, we will refer to the parties by their first names.

2001 to 2008 (first grade until the beginning of eighth grade), John's daughter lived with them.

{¶ 4} Rebecca had graduated from high school in 1981 and had worked several factory jobs between 1984 and December 2001, when Hobart laid her off. At that time, Rebecca became a stay-at-home mother for John's daughter. At John's choice, Rebecca did not work outside the home while she was mothering his daughter; the parties also planned to have children and did not want them cared for by babysitters. Ultimately, however, they did not have any children together.

{¶ 5} In 2008, the daughter left the parties' home. Rebecca did not return to work for two years, but then began babysitting for children in the marital home in 2010. Between that time and September 2016, Rebecca baby-sat for children five days a week, earning about $150 to $160 per week, which she contributed to the family income. However, in July 2016, John told her that he wanted a divorce and wanted her out of the house. As a result, Rebecca informed her clients that she would not be able to babysit in the marital home. She lost clients, but still babysat for one family in their home, about two days per week.

{¶ 6} John had a college degree in business and worked for Panasonic for 15 years as a production scheduler. After being laid off at Panasonic, he worked at ABX for a year and a half and left for a better job at U.S. Truck, where he worked from 2004 through 2011. While at U.S. Truck, John was a clerk, then became a maintenance supervisor, and finally was a safety supervisor from 2008 to 2011, when he lost his job due to downsizing. He subsequently began employment with Bulk Transit as safety director in late March 2011.

{¶ 7} In February 2016, John resigned in lieu of being fired from his employment as a safety director for Bulk Transit, where he had worked for nearly five years.   At the time, John was earning about $52,000 per year.   A year before John resigned, he was not happy and had divorce in mind.   According to John, he was let go for non-complying, i.e., not giving drug tests to his employees.   To comply and give those tests, he would only have had to notify the individuals that they would have to take the tests.   John had successfully done this during the four preceding years.   *See* September 11, 2017 Transcript ("Tr. 2"), p. 13.[2]   At the time he was unhappy with his marriage, he decided not to give the notice to his employees anymore.   *Id.* at pp. 13-14.

{¶ 8} John was subsequently reemployed on May 1, 2017, at Rollins Moving and Storage as a laborer, making $11.00 an hour.   July 11, 2017 Transcript ("Tr. 1"), pp. 30-32.   He worked there until the beginning of April 2018, when he took a job at a local hospital, earning $10.54 per hour, for a 40-hour week.   The income from the latter job amounted to $21,923 per year, or about $30,000 less annually than he earned at Bulk Transit.

{¶ 9} John filed for divorce in November 2016, and Rebecca filed an answer and counterclaim for divorce.   In late January 2017, an agreed temporary order was filed, stating that neither party would have exclusive use of the marital residence and that the parties were to "continue to pay the martial debts for the residence and food as has been their custom."   Doc. #10, p. 1.   The parties, thus, continued to live in the same household until the final decree was filed in late May 2018.

{¶ 10} In the meantime, the trial court held evidentiary hearings on seven days

---

[2] There were seven days of hearings in this case, resulting in seven transcripts.

from July 11, 2017 to April 17, 2018. The court then filed a judgment entry and decree of divorce on May 24, 2018, granting the divorce, disposing of the property, and addressing other issues. This appeal followed.

## II. Applicable Date Under R.C. 3105.171(A)(2)

**{¶ 11}** Rebecca's First Assignment of Error states that:

The Trial Court Materially Erred and Abused Its Discretion Against the Manifest Weight of the Evidence When It Failed to Find That the Date That the Parties Began Living Together [W]as the Commencement Date of the Marriage for 3105.171 Purposes.

**{¶ 12}** During the proceedings, Rebecca filed a motion asking the trial court to consider May 2000 as the commencement date of the marriage for purposes of dividing the marital property under R.C. 3105.171. Using the earlier date was important to Rebecca because John purchased two properties – the martial residence and a rental property – shortly before the ceremonial date of the marriage, which was April 12, 2003. However, prior to that time (since May 2000), the parties were living together as a family unit. The trial court rejected Rebecca's argument and decided to use the ceremonial marriage date as the start of the marriage. Although disagreement exists among appellate districts on this point, the trial court concluded: (1) that we had not addressed the issue; and (2) that the approach of the Ninth District Court of Appeals in *Ward v. Ward*, 9th Dist. Summit No. 26372, 2012-Ohio-5658, was "more reflective of legislative intent." Doc. #25, p. 3.

**{¶ 13}** In divorce actions, trial courts have broad discretion in deciding an equitable

division of property. *Berish v. Berish*, 69 Ohio St.2d 318, 319, 432 N.E.2d 183 (1982). We may modify or reverse the court's decision only for abuse of discretion. *Id.* However, where interpretation of statutes is involved, our review is de novo, and we give no deference to a trial court's conclusions of law. *Buckingham v. Buckingham*, 2d Dist. Darke No. 1626, 2004-Ohio-1942, ¶ 11, citing *Miamisburg v. Wood*, 137 Ohio App.3d 623, 625, 739 N.E.2d 410 (2d Dist.2000).

{¶ 14} R.C. 3105.171(A)(2) provides that, as used in that statute, "[d]uring the marriage" means whichever of the following is applicable:

(a) Except as provided in division (A)(2)(b) of this section, the period of time from the date of the marriage through the date of the final hearing in an action for divorce or in an action for legal separation;

(b) If the court determines that the use of either or both of the dates specified in division (A)(2)(a) of this section would be inequitable, the court may select dates that it considers equitable in determining marital property. If the court selects dates that it considers equitable in determining marital property, "during the marriage" means the period of time between those dates selected and specified by the court.

{¶ 15} In *Ward*, the trial court used a date prior to marriage for dividing assets. On appeal, the Ninth District Court of Appeals held that "[a] determination that a marriage commenced prior to the ceremonial date of the marriage is improper and would effectively resurrect common law marriages after the legislature abolished them in 1991." *Ward*, 9th Dist. Summit No. 26372, 2012-Ohio-5658, at ¶ 27. In contrast, the Eighth District Court of Appeals has long "upheld the application of R.C. 3105.171(A)(2) to extend the

parties' marriage to include their period of cohabitation prior to marriage." *Al-Mubarak v. Chraibi*, 8th Dist. Cuyahoga No. 101392, 2015-Ohio-1018, ¶ 21, citing *Bradley v. Bradley*, 8th Dist. Cuyahoga No. 78400, 2001 WL 755847 (July 5, 2001).

{¶ 16} Contrary to the trial court's conclusion, we have considered the issue of whether property acquired prior to the parties' ceremonial marriage may be, "nevertheless, acquired 'during the marriage,' and thus subject to an equitable division" pursuant to R.C. 3105.171(A)(2)(b). *Drumm v. Drumm*, 2d Dist. Montgomery No. 16631, 1999 WL 198120, *3 (March 26, 1999). In *Drumm*, the trial court used a date before the parties' ceremonial marriage to divide property that the husband had acquired prior to the date of marriage. In considering whether this was an abuse of discretion, we commented that:

R.C. 3105.171(A)(2)(b) establishes no standards or other criteria to guide the court in determining whether and when use of the dates specified in division (A)(2)(a) would be inequitable. The section appears to reiterate the general grant of "full equitable powers and jurisdiction appropriate to the determination of all domestic relations matters" conferred on the courts of common pleas by R.C. 3105.011. The effect of that grant has been held "to permit the court a free and full exercise of its general equity powers to adjust property rights between opposing spouses as it determines will serve the ends of justice." *DeMilo v. Watson, Exr.* (1957), 166 Ohio St. 433, 436, 143 N.E.2d 707. Nevertheless, it has also been held that "there must be a statutory basis upon which to exercise those powers before they may be put into play." *Haynie v. Haynie* (1959), 169 Ohio St. 467, 469, 159 N.E.2d

765.

To construe and/or apply R.C. 3103.171(A)(2)(b) to permit a domestic relations court to select dates which determine the "duration of the marriage" for purposes of property division absent some rational criteria for that determination and some evidence which satisfies those criteria is arbitrary, and arbitrary action constitutes a denial of due process. *Stanton v. State Tax Com* (1926), 114 Ohio St. 658, 151 N.E. 760. To thus deprive persons of their property without due process is in violation of the Fifth Amendment to the Constitution of the United States and Article I, Section 16 of the Constitution of Ohio. *Clifton Hills Realty Co. v. Cincinnati* (1938), 60 Ohio App. 443, 21 N.E.2d 993.

*Drumm*, 2d Dist. Montgomery No. 16631, 1999 WL 198120, at *3-4.

**{¶ 17}** Notably, however, we found such a basis. In this regard, we commented that:

Some meaning concerning the equities involved in R.C. 3105.171(A)(2)(b) and guidance in its application may be gleaned from the provision of R.C. 3105.011, which permits the court to exercise full equitable powers "appropriate to the determination" of domestic relations matters. In this context, that would permit a domestic relations court to employ R.C. 3105.171(A)(2)(b) to award one spouse an interest in the property of the other on some basis different from and in addition to the interests that are created by the marriage. *Those equities do not replicate the considerations involved in a state of marriage that exists at common law;*

*that is, an assumed matrimonial state that involves shared duties and responsibilities. Rather, R.C. 3105.171(A)(2)(b) reasonably requires a finding that one spouse acquired a substantial interest in the property of the other even before the marriage commenced. That finding must be based on some evidence of an investment or contribution by one spouse creating that form of interest in the property of the other.*

(Emphasis added.) *Id.* at *4.

{¶ 18} After considering the matter, we reversed the trial court's decision to award the wife an equitable share of the property from the date that the parties began living together 11 years prior to their marriage. Specifically, we noted the lack of evidence that the wife had made "any substantial contribution" to the husband's separate property prior to their ceremonial marriage. *Id.* While she had stayed over at the house before the ceremonial marriage, "she made no contributions toward its purchase or improvement." *Id.* She also did not contribute to the husband's other assets, like boats, investment accounts, or his family business. Indeed, we noted that the only date appearing to coincide with the earlier date used for the "duration of the marriage" was that the wife had been given a bowling team membership card the following day. *Id.* In a later case, and consistent with *Drumm*, we did allow a date prior to the ceremonial marriage to be used. *See Richards v. Richards*, 2d Dist. Montgomery No. 18660, 2001 WL 1346043, *4 (Nov. 2, 2001).

{¶ 19} As noted, the trial court rejected any consideration of this matter, which was an error of law. We recognize that there is a difference of opinion on this point. However, a majority of appellate districts have ruled on the issue, and the Ninth District's

decision in *Ward* is in a distinct minority. *Compare, e.g., Ward*, 9th Dist. Summit No. 26372, 2012-Ohio-5658 (refusing to use date prior to ceremonial marriage); *D'Hue v. D'Hue*, 8th Dist. Cuyahoga No. 81017, 2002-Ohio-5857, ¶ 90 (allowing date prior to marriage to be used where parties started functioning as husband and wife, both socially and economically, their finances were interdependent, and wife was financially dependent on husband); *Flick v. Flick*, 12th Dist. Butler No. CA2001-05-111, 2001-Ohio-8673, *2 (trial court did not abuse its discretion in concluding start of marriage was before ceremonial marriage; "the parties lived together continuously since their engagement in June 1994. After this time, they pooled their financial resources to maintain a common household, even purchasing property together in anticipation of their retirement"); *Gibson v. Gibson*, 3d Dist. Marion No. 9-07-06, 2007-Ohio-6965, ¶ 22, fn.2 (noting that courts may choose a date prior to ceremonial marriage, but declining to do so in that case since the issue was not raised at trial); *Davis v. Davis*, 11th Dist. Geauga No. 2011-G-3018, 2013-Ohio-211, ¶ 89-90 (citing *D'Hue*, and concluding that parties' de facto relationship began four years before marriage for purposes of spousal support award); *Staskey v. Staskey*, 7th Dist. Jefferson No. 93-J-5, 1995 WL 152988, *4 (Apr. 4, 1995) (no abuse of discretion in using date well before ceremonial marriage as marital acquisition date); *Colello v. Colello*, 6th Dist. Lucas No. L-95-322, 1996 WL 446842, *4 (Aug. 6, 1996) (because no evidence of intent to have common law marriage existed, trial court abused discretion in using date two years before ceremonial marriage); *Dach v. Homewood*, 10th Dist. Franklin No. 14AP-502, 2015-Ohio-4191, ¶ 17 (trial court can use date prior to ceremonial marriage; under facts of the case, court did not abuse its discretion by deciding ceremonial date was not inequitable).

{¶ 20} In its decision, the trial court did not specify the legislative intent to which it referred (other than mentioning abolishment of common law marriage), nor does *Ward* discuss "legislative intent." As noted, in *Ward*, the court did say that "[a] determination that a marriage commenced prior to the ceremonial date of the marriage is improper and would effectively resurrect common law marriages after the legislature abolished them in 1991." *Ward* at ¶ 27, citing R.C. 3105.12(B). The statute abolishing common law marriages was adopted in June 1991 and was effective in October 1991. *See* H.B. No. 32, 1991 Ohio Laws File 41.

{¶ 21} However, before H.B. No. 32 was passed, R.C. 3105.171 was amended in August 1990. At that time, the current wording in R.C. 3105.171(A)(2)(b) concerning "during the marriage" was added. *See* H. B. No. 514, 1990 Ohio Laws File 276. The amended statute was effective in January 1991, and the pertinent language thereafter has never changed, despite later amendments to R.C. 3105.171 in 1992, 2000, 2008, 2010, and 2015.

{¶ 22} "In construing a statute, a court's paramount concern is the legislative intent." *State ex rel. Herman v. Klopfleisch*, 72 Ohio St.3d 581, 584, 651 N.E.2d 995 (1995). To determine "legislative intent, the court first looks to the language in the statute and the purpose to be accomplished." *State v. S.R.*, 63 Ohio St.3d 590, 594-95, 589 N.E.2d 1319 (1992). "If the meaning of a statute is unambiguous and definite, then it must be applied as written and no further interpretation is appropriate." *Herman* at 581. "However, where a statute is found to be subject to various interpretations, a court called upon to interpret its provisions may invoke rules of statutory construction in order to arrive at legislative intent." *Cline v. Ohio Bur. of Motor Vehicles*, 61 Ohio St.3d 93, 96, 573

N.E.2d 77 (1991).

{¶ 23} Viewing the language in R.C. 3105.171 and its purpose, it is clear that the intent is for equity to be done between divorcing parties. For example, even if a spouse has separate property, the court may decide not to disburse the property to that spouse. *See* R.C. 3105.171(D). The court may also make a distributive award from separate property in lieu of a division of marital property "to achieve equity between the spouses," if division of marital property would be burdensome or impracticable. R.C. 3105.171(E)(2). The terms "equity" and "equitable" are also used throughout the statute. In addition, R.C. 3105.171(C)(1) provides, as a starting point, that "the division of marital property shall be equal." R.C. 3105.171(C)(2) further provides that "[e]ach spouse shall be considered to have contributed equally to the production and acquisition of marital property." In view of these facts, we do not find that R.C. 3105.171(A)(2)(b) is in need of interpretation.

{¶ 24} Assuming for the sake of argument that R.C. 3105.171(A)(2)(b) is subject to different interpretations, the principles of statutory construction found in R.C. 1.49 let courts consider:

(A) The object sought to be attained;

(B) The circumstances under which the statute was enacted;

(C) The legislative history;

(D) The common law or former statutory provisions, including laws upon the same or similar subjects;

(E) The consequences of a particular construction;

(F) The administrative construction of the statute.

**{¶ 25}** As a preliminary point, Ohio does not have official legislative history. *See, e.g., DIRECTV, Inc. v. Levin*, 181 Ohio App.3d 92, 2009-Ohio-636, 907 N.E.2d 1242, ¶ 33 (10th Dist.). Moreover, nothing accompanying the amendment of R.C. 3105.171 or R.C. 3105.12 (the statute pertaining to common law marriage) indicates the legislative history or intent. Our decisions interpreting R.C. 3105.171(A)(2)(b) were also issued several years after both statutes became effective – meaning that we would have been aware that common law marriage had been abolished.

**{¶ 26}** With respect to the consequences of a particular construction, Rebecca has discussed *State v. Carswell*, 114 Ohio St.3d 210, 2007-Ohio-3723, 871 N.E.2d 547, which addressed the Defense of Marriage Amendment and how it affected an existing domestic violence statute. In 2004, the Ohio Constitution was amended to provide that: " 'Only a union between one man and one woman may be a marriage valid in or recognized by this state and its political subdivisions. This state and its political subdivisions shall not create or recognize a legal status for relationships of unmarried individuals that intends to approximate the design, qualities, significance or effect of marriage.' " *Id.* at ¶ 2, quoting Ohio Constitution, Article XV, Section 11.

**{¶ 27}** Courts have held that the entirety of the Defense of Marriage Act Amendment, and not merely the first sentence, is unconstitutional, based on the decision in *Obergefell v. Hodges*, 135 S.Ct. 2584, 192 L.Ed.2d 609 (2015).[3] *See Petty v. Blount-Petty*, 2017-Ohio-7035, 95 N.E.3d 729, ¶ 21-23 (5th Dist.), citing *Obergefell v. Hodges*, S.D.Ohio No. 1:13-cv-501, 2-3 (Nov. 2, 2015). Thus, it is questionable whether the

---

[3] In *Obergefell*, 135 S.Ct. 2584, 192 L.Ed.2d 609, the court invalidated such state amendments, including Ohio's, because they deprived same-sex couples of equal protection and due process rights under the Fourteenth Amendment.

amendment's prohibition against creating "legal relationships" approximating marriage is still viable. However, even if that were so, it would not affect the result in the case before us.

{¶ 28} in *Carswell*, the Supreme Court of Ohio stressed that statutes adopted before the Defense of Marriage Amendment (like R.C. 3105.171) still enjoy a presumption of constitutionality, because "the general rule as to the interpretation of constitutional amendments is that ' "[t]he body enacting the amendment will be presumed to have had in mind existing constitutional or statutory provisions and their judicial construction, touching the subject dealt with." ' " *Id.* at ¶ 6, quoting *State ex rel. Lake Cty. Bd. of Commrs. v. Zupancic*, 62 Ohio St.3d 297, 303, 581 N.E.2d 1086 (1991) (Moyer, C.J., dissenting.) (Other citation omitted.)

{¶ 29} In *Carswell*, the Supreme Court of Ohio noted that the Defense of Marriage Amendment did not expressly repeal the statute under consideration, and that it, therefore, would have to consider whether the statute had been repealed by implication. *Id.* at ¶ 8. The court stressed, however, that "repeals by implication are disfavored as a matter of judicial policy." *Id.* Regarding the part of the amendment that prohibited creating legal relations, the court observed that it "prohibits the state and its political subdivisions from circumventing the mandate of the first sentence by recognizing a legal status similar to marriage (for example, a civil union)." *Id.* at ¶ 15.

{¶ 30} In *Bryan v. Bryan*, 8th Dist. Cuyahoga No. 97817, 2012-Ohio-3691, the Eighth District Court of Appeals considered this issue in detail, commenting that *Carswell* had "explained the difference between the institution of marriage and other kinds of relationships." *Id.* at ¶ 20. After discussing the differences, the court stated that:

"Thus, the Ohio Supreme Court explained that any legally established relationship bearing less than all the attributes of marriage is constitutional." *Cleveland Taxpayers for Ohio Constitution v. Cleveland*, 8th Dist. No. 94327, 2010-Ohio-4685 (City's domestic partner registry did not violate the Marriage Amendment because it did not give partners all of the attributes of a marriage). See also *Fitz v. Fitz*, 8th Dist. No. 92535, 2009-Ohio-5236 (Marriage Amendment does not prevent courts from making factual determination of cohabitation because "cohabitation" does not confer a legal status tantamount to marriage). Likewise, here, the court only looked at the years the parties lived together for purposes of making an equitable distribution of property. The court's doing so, did not give the parties' relationship prior to the marriage all of the attributes of a marriage. The date was only extended for purposes of making an equitable distribution of the property.

R.C. 3105.171(A) also does not mandate that a marriage commences every time parties live together. The provision simply provides the trial court with the discretion to apply an earlier date if the facts require it in order to make an equitable distribution of property.

*Id.* at ¶ 21-22.

{¶ 31} We agree. By choosing a date prior to ceremonial marriage, trial courts are simply acting within their equitable discretion to divide assets, not creating a legal status of marriage.

{¶ 32} Obviously, *Carswell* and *Bryan* were decided before *Obergefell*. However,

if we apply the principles of construction in *Carswell* to the 1991 amendment of R.C. 3105.12 (which prohibited common law marriage), the result is the same. Specifically, R.C. 3105.171(A)(2)(b) already existed at the time common law marriage was prohibited. R.C. 3105.12 did not expressly repeal the existing statute, and there is no indication of an implicit intent to repeal.

{¶ 33} Accordingly, the trial court erred as a matter of law by refusing to consider a date prior to the ceremonial marriage for purposes of deciding if the Hornbecks' property was separate or marital. As a result, this matter must be remanded for consideration of whether applying the ceremonial date of marriage was inequitable.

{¶ 34} We note that in the judgment entry and decree of divorce, the trial court made the following statement about the parties' credibility:

> The Court finds from the totality of the credible evidence, that both of the parties in this case lack credibility, and to this end, they were both readily willing and able to disregard the truth in order to achieve a financial advantage on almost every issue before this Court.

Doc. #41, p. 2.

{¶ 35} Despite the court's statement, several pertinent matters were either undisputed or were established by extrinsic evidence. First of all, Rebecca was employed when the parties moved in together in May 2000. They were engaged at the time and planned to marry. At that point, Rebecca had substantial savings and 401k accounts. After the parties moved in together, they pooled their finances to maintain a common household. Although John purchased two properties (the marital home and the rental property) before the marriage, Rebecca did contribute her own money toward

improvements. Specifically, and unlike the wife in *Drumm*, Rebecca used her own funds ($8,790) to repair the roof on the marital home in August 2001, prior to the parties' ceremonial marriage.

{¶ 36} After John's daughter came to live with them in 2001, the parties chose for Rebecca to stay home and provide care for her. Specifically, both parties testified that John did not want Rebecca to work; instead, she was to take care of the house and daughter. There was no dispute that Rebecca performed in all parental capacities, including coaching sports teams and taking the daughter to sports games, band practices, and other events. Rebecca was, thus, financially dependent on John both before and after the ceremonial marriage after she stopped working outside the home.

{¶ 37} In addition, Rebecca offered evidence at trial about other financial contributions she made from her separate property between the time she moved in and the date of the ceremonial marriage. John did not dispute these items and offered no contradictory evidence. These items included: paying for a rust remover system for the marital residence; substantial amounts paid for utilities for the marital residence, including phone, gas, trash, and electric; substantial payments on credit cards in John's name; payments for insuring the house and property; life insurance payments for John's daughter; property tax payments; and payments to an attorney regarding the rental property.

{¶ 38} Accordingly, we agree with Rebecca that evidence existed upon which to conclude that May 2000 could have been selected under R.C. 3105.171(A)(2)(b) as the equitable date for determining marital property. However, since this is a decision to be made in the first instance by the trial court, we will simply reverse the trial court on this

point, and remand for further proceedings consistent with our opinion.

{¶ 39} As a final matter, when Rebecca's counsel filed a motion during trial, asking the court to use a de facto beginning date for the marriage, the trial court stated that "[i[t would have been nice to have this document prior to the third day of testimony in the cases." September 21, 2017 Transcript ("Tr. 3"), p. 6. As a courtesy to the court, this was undoubtedly true. However, "no motion is required for the trial court to consider the use of a de facto date. It is within the exercise of the court's equitable powers, as well as its statutory authority, for the trial court to declare and apply a date for the division of marital property." *Heyman v. Heyman*, 10th Dist. Franklin No. 05AP-475, 2006-Ohio-1345, ¶ 35.

{¶ 40} Based on the preceding discussion, Rebecca's First Assignment of Error is sustained.


### III. John's Voluntary Underemployment

{¶ 41} Rebecca's Second Assignment of Error states that:

The Trial Court Materially Erred and Abused Its Discretion Against the Manifest Weight of the Evidence When It Held That the Plaintiff-Appellee-Husband Was Not Voluntarily Underemployed.

{¶ 42} According to Rebecca, the trial court abused its discretion and also entered a judgment that was against the manifest weight of the evidence when it found that John was not voluntarily underemployed. Rebecca points to John's own admissions in his testimony, which demonstrate that, as he was contemplating divorce, John was fired from a well-paying job for failing to perform a minimal task (notifying his staff of the need to be

drug-tested), when he had performed that task for the previous four years he had been employed. John did not respond to this assignment of error (nor did he respond to any of the assignments of error, other than merely citing case law indicating that trial court decisions are reviewed for abuse of discretion).

{¶ 43} In rejecting Rebecca's request for spousal support, the trial court concluded that, despite having earned $52,000 per year shortly before filing for divorce, and currently being employed at $11 an hour, John was not voluntarily underemployed. The court noted that John had contended this was the only job he could find and that he was looking for other work. The court then expressed hope that John would find a better job when one became available. Doc. #41 at p. 19.

{¶ 44} " 'When considering the relative earning abilities of the parties in connection with an award of spousal support, Ohio courts do not restrict their inquiry to the amount of money actually earned, but may also hold a person accountable for the amount of money [that] a "person could have earned if he made the effort." ' " *Kraft v. Kraft*, 2d Dist. Montgomery No. 25982, 2014-Ohio-4852, ¶ 21, quoting *Donese v. Donese*, 2d Dist. Greene No. 97-CA-70, 1998 WL 165012, *3 (April 10, 1998) (Other citation omitted.) *Accord Blevins v. Blevins*, 2d Dist. Greene No. 2018-CA-23, 2019-Ohio-297, ¶ 10; *Williams-Booker v. Booker*, 2d Dist. Montgomery No. 21752, 2007-Ohio-4717, ¶ 34. "Because R.C. 3105.18(C) permits inquiry into a party's earning potential, Ohio courts often impute income to parties who are voluntarily underemployed or otherwise not working up to their full earning potential." *Miller v. Miller*, 2d Dist. Montgomery No. 14540, 1994 WL 730560, *4 (Dec. 28, 1994).

{¶ 45} The Supreme Court of Ohio has said that "the question whether a [litigant]

is voluntarily (i.e., intentionally) unemployed or voluntarily underemployed is a question of fact for the trial court. Absent an abuse of discretion, that factual determination will not be disturbed on appeal." *Rock v. Cabral*, 67 Ohio St.3d 108, 112, 616 N.E.2d 218 (1993). An abuse of discretion " 'implies that the court's attitude is unreasonable, arbitrary or unconscionable.' " *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). "It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). Decisions are unreasonable if no sound reasoning supports the decision. *Id.* *Accord Aldo v. Angle*, 2d Dist. Clark No. 09-CA-103, 2010-Ohio-2008, ¶ 33.

{¶ 46} After reviewing the record, we cannot find an absence of sound reasoning for the trial court's decision when giving deference to the court's credibility determinations. The trial court found that John lacked credibility and was "both readily willing and able to disregard the truth in order to achieve a financial advantage on almost every issue before this Court." Doc. #41 at p. 2.

{¶ 47} However, the court evidently accepted John's testimony that he was not voluntarily underemployed even though in some respects John's testimony supported the voluntary nature of his underemployment. As noted in the statement of facts, John resigned in lieu of being fired from his employment as a safety director for Bulk Transit, where he had worked for nearly five years. This occurred in February 2016, when John was earning about $52,000 per year. John also stated that a year before he resigned,

he was not happy and had divorce in mind.   In this regard, the following exchange took place:

Q.   You lost your job in February of '16, correct?

A.   Yes.

* * *

Isn't it true that when you determined you did not want to be married to Mrs. Hornbeck that you lost your job for doing something that would have been quite simple to do, administer a test –

* * *

The WITNESS:   Please repeat that.

Q.   Isn't it true – well, let me ask you a different way, then.   Were you let go for non-complying, for not giving tests, correct?

A.   Correct.

Q.   What would you have to do to physically do, to comply and give those tests.

A.   To notify the individuals that they need to take the tests.

Q.   And had you done that successfully for the four or five years before that?

Four years, yes.

Q.   And then at the time you were unhappy with the marriage, you just didn't do that anymore, did you?

A.   Correct.

Q.   Okay.   So now instead of making $52,000 a year, you are making * * *

$11 an hour.

A. Correct.

Tr. 2 at pp. 12-14.

**{¶ 48}** Even if the trial court had found John to be voluntarily underemployed, the second component of its inquiry would have been what amount of income John should be accountable for if he made the effort. *Kraft*, 2d Dist. Montgomery No. 25982, 2014-Ohio-4852, at ¶ 20. There was conflicting evidence on this issue. John testified that he had tried to find better-paying work. However, he admitted that he was selective in applying for positions. John testified that he had not applied at trucking companies where he had not worked in Springfield because he was looking for a safety position and none were available when he looked. Tr. 2, p. 11. Nonetheless, the court was free to believe John's testimony that he had made an adequate effort to find a higher paying job and evidently concluded that John was realizing his full employment capacity.

**{¶ 49}** Given John's testimony, if believed by the court, there was a sound basis for the trial court's decision not to impute income to John. Based on the preceding discussion, we find that the trial court did not abuse its discretion in concluding that John was not voluntarily underemployed. Rebecca's Second Assignment of Error, therefore, is overruled.

IV. Rebecca's Voluntary Underemployment

**{¶ 50}** Rebecca's Third Assignment of Error states that:

The Trial Court Materially Erred and Abused Its Discretion Against the Manifest Weight of the Evidence When It Found That [sic] the

Defendant-Appellee-Wife To Be Voluntarily Underemployed.

{¶ 51} In addressing the issue of spousal support, the trial court concluded that Rebecca was voluntarily underemployed. The court based its decision on the fact that Rebecca was babysitting two days a week, for an average income of $70 per week, and was not looking for work at the time. In addition, the court noted that Rebecca had not looked for work during the 19 months the case had been pending. Doc. #41 at p. 19. As a result, the court imputed income to Rebecca equal to what John was earning – $11.00 per hour.

{¶ 52} The standard of review was outlined above. According to Rebecca, the trial court should have considered that she had been out of the workforce for many years and that she had health problems. In the latter regard, Rebecca stresses that she was not required to present expert testimony of a disability so long as she testified and was subject to cross-examination.

{¶ 53} We have said that "[t]he medical cause of a person's disability is not an essential fact requiring proof when mere disability, regardless of cause, is asserted in an action for divorce or support." *Milam v. Milam*, 2d Dist. Greene No. 94-CA-23, 1994 WL 579722, *2 (Oct. 19, 1994). Furthermore, we have said that expert medical testimony is not needed to substantiate " 'certain medical problems where the injured party testifies and is subject to thorough cross-examination.' " *Billingham v. Billingham*, 2d Dist. Montgomery No. 18403, 2001 WL 127764, *3 (Feb. 16, 2001), quoting *Gullia v. Gullia*, 93 Ohio App.3d 653, 662, 639 N.E.2d 822 (8th Dist.1994).

{¶ 54} Nonetheless, the trial court was not required to believe Rebecca's testimony about her health conditions, and it clearly did not believe her. *See Milam* at *2 ("[a]

factfinder's decision whether to credit a particular witness is not a matter for review upon appeal").

{¶ 55} As to Rebecca's work history, she did have prior factory work experience that ended in 2001. For around the next 17 years, she was a stay-at-home parent or wife, except between 2010 and 2018, when she baby-sat children. In light of these facts, we may have used a different amount of wages to be imputed to Rebecca. Specifically, when Rebecca worked five days a week babysitting, she earned about $150 or $160 a week, or between $7,800 to $8,320 per year. The amount the trial court imputed to her was $21,450, which seems high, based on the amount of time she had been out of the workforce and her lack of college or vocational education after high school. However, an unsound reasoning process is not established where "the reviewing court, were it deciding the issue de novo, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result." *AAAA Ents.*, Inc., 50 Ohio St.3d at 161, 553 N.E.2d 597.

{¶ 56} Accordingly, Rebecca's Third Assignment of Error is overruled.


V. Rebecca's Alleged Health Issues

{¶ 57} Rebecca's Fourth Assignment of Error states as follows:

The Trial Court Materially Erred and Abused Its Discretion Against the Manifest Weight of the Evidence When It Found That the Defendant-Wife Had Not Provided Sufficient Evidence to Suggest that Defendant Has Health Issues That Prevent Her From Seeking and Obtaining Gainful Employment.

{¶ 58} According to Rebecca, the trial court erred in finding that she did not provide sufficient evidence of health issues prohibiting her from seeking employment. One factor the court mentioned was that Rebecca had not been to a doctor in two years.

{¶ 59} According to Rebecca, she testified in detail about her health issues and about the fact that she had not been able to afford to see a doctor. Rebecca contends on appeal that she walks bent over and often uses a cane. Again, while Rebecca did not have to provide expert testimony, the trial court did not believe her account. We have often stressed that "[t]he decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). There is also no evidence in the record about Rebecca's gait or her use of a cane. We "cannot add matter to the record * * *, which was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter." *State v. Ishmail*, 54 Ohio St.2d 402, 377 N.E.2d 500 (1978), paragraph one of the syllabus. For these reasons, the Fourth Assignment of Error is overruled.

VI. Real Estate

{¶ 60} Rebecca's Fifth Assignment of Error states that:

The Trial Court Materially Erred and Abused Its Discretion Against the Manifest Weight of the Evidence When It Failed to Find Some Portion of the Real Estate Parcels to be Marital Property.

{¶ 61} Under this assignment of error, Rebecca contends that, even if a date before the ceremonial date of marriage were not used, the trial court erred in failing to

consider that the properties purchased before marriage were mortgaged after the date of marriage and were also were paid for with marital funds. Thus, even if the properties were considered as originally separate, Rebecca argues that she was entitled to a portion of the equity that accrued during marriage.

{¶ 62} Pursuant to R.C. 3105.171(A)(3)(a)(iii), marital property includes: "[e]xcept as otherwise provided in this section, all income and appreciation on separate property, due to the labor, monetary, or in-kind contribution of *either or both* of the spouses that occurred during the marriage." (Emphasis added). After deciding which property is marital and which is separate, the trial court "shall divide the marital and separate property *equitably* between the spouses * * *." (Emphasis added.) R.C. 3105.171(B).

{¶ 63} Increased equity in a martial home during the marriage has been appropriately treated as marital property. *See, e.g., Wright v. Cramer*, 2018-Ohio-764, 107 N.E.3d 836, ¶ 15 (2d Dist.); *Spicer v. Spicer*, 12th Dist. Butler No. CA95-06-115, 1996 WL 204115, *2 (Apr. 29, 1996); *Goebel v. Werling*, 9th Dist. Summit No. 19385, 1999 WL 548969, *1 (July 28, 1999) ("reduction in a mortgage during a marriage is equivalent to a marital investment and is considered part of the marital equity"); *Scott v. Scott*, 11th Dist. Trumbull No. 2007-T-0059, 2008-Ohio-530, ¶ 21.

{¶ 64} In the case before us, the marital home was purchased for $90,000 in August 2000. At that time, John took out a mortgage for $70,000. He refinanced for $67,600 in November 2002, shortly before the ceremonial marriage date. The property was then refinanced in January 2011 (during the marriage) for $73,600. While the other mortgages were in only John's name, this mortgage was in both parties' names. However, John never changed the deed to include Rebecca's name.

{¶ 65} During the first day of trial, John identified the mortgage for the marital home and stated that the principal balance was $35,131.14 as of March 3, 2017. Tr. 1 at p. 41. During the second day of trial (September 11, 2017), he stated that about $39,000 was still owed.

{¶ 66} For the tax years 2013, 2014, and 2015, John valued the marital property on Form 8829 (expenses for business use of home) as having a fair market value of $130,000. However, his real estate witness at trial indicated a value for the property of only $64,000, even though the county auditor had appraised the property at $89,020 for the house and $18,500 for the land.

{¶ 67} As was noted, the parties also had a rental property. John purchased this property prior to marriage from his father for $40,000. One mortgage was placed on the property in January 2003. Later, in November 2008, a mortgage for $37,400 was taken out for the rental property. At the time of trial, only about $4,900 was still owed on the rental property. John's real estate witness valued the house at $38,000, although the auditor had listed the land as having a value of $24,980 and the house as having a value of $40,810. The real estate witness later stated that his figures were what the parties would net if they sold the properties themselves, after mortgages and taxes were deducted. Tr. 3 at pp. 43-45.

{¶ 68} The trial court gave John the full amount of the equity in these houses as his separate property, and divided a vacant lot that was valued at $6,000 between the parties. It is clear that equity accrued during the marriage, as a $73,600 mortgage taken out in 2011 for the marital property (and in both parties' names) was reduced to slightly more than $35,000 by the time of trial. In addition, even if one assumes a $38,000 value

for the rental property, the property was mortgaged in 2008 for $37,400, which had been reduced by the time of trial to $4,900. The total amount of equity, thus, was at least $71,000, but the trial court did not award any of this money to Rebecca. Instead, the court awarded her only one-half of the value of the $6,000 property, meaning that John received $74,000 or more in assets, and Rebecca received $3,000 in assets. We cannot conclude that the court's decision was based on sound reasoning.

{¶ 69} Under this assignment of error, Rebecca also contends that the trial court could have made a distributive award. The trial court did not order a distributive award and simply concluded Rebecca should not receive any equitable relief, including $23,500 and other items she sought.

{¶ 70} "A distributive award is 'any payment or payments, in real or personal property, that are payable in a lump sum or over time, in fixed amounts, that are made from separate property or income, and *that are not made from marital property and do not constitute payments of spousal support*, as defined in section 3105.18 of the Revised Code.' " (Emphasis added.) *Marcum v. Marcum*, 116 Ohio App.3d 606, 610, 688 N.E.2d 1085 (2d Dist.1996), quoting R.C. 3105.171(A)(1). Under R.C. 3105.171(E)(1), "[t]he court may make a distributive award to facilitate, effectuate, or supplement a division of marital property. The court may require any distributive award to be secured by a lien on the payor's specific marital property or separate property." A supplement would be in addition to an award of marital property.

{¶ 71} R.C. 3105.171(F) outlines factors that should be considered in making a distributive award, and R.C. 3105.171G) further provides that, "[i]n any order for the division or disbursement of property or a distributive award made pursuant to this section,

the court shall make written findings of fact that support the determination that the marital property has been equitably divided and shall specify the dates it used in determining the meaning of 'during the marriage.' "   Again, we apply an abuse of discretion standard in our review.   *See, e.g., Briganti v. Briganti*, 9 Ohio St.3d 220, 222, 459 N.E.2d 896 (1984).

{¶ 72} In view of the facts of this case, the trial court could have made a distributive award to Rebecca, even if the court had used the ceremonial marriage date and had concluded that the equity in separate property was not marital property (although this would have been incorrect).   *See e.g., Chance v. Chance*, 9th Dist. Wayne No. 02CA0003, 2002-Ohio-5767, ¶ 13 (trial court did not abuse its discretion in disbursing farm to husband as separate property and then ordering distributive award to wife of half the value of property after taxes.   R.C. 3105.171(E)(1) clearly authorizes a trial court to 'make a distributive award to facilitate, effectuate, or supplement a division of marital property.' ")

{¶ 73} Accordingly, the Fifth Assignment of Error is sustained, and this matter will be remanded for the trial court to make a decision on the amount of equity in the properties and to divide the equity equitably as a marital asset.   Because we have sustained the First and Fifth Assignments of Error, the court must also reevaluate the distributive award issue.

## VII.   Waste and Financial Misconduct

{¶ 74} Because the Sixth and Seventh Assignments of Error address the same point, we will consider them together.   Rebecca's Sixth and Seventh Assignments of Error state:

The Trial Court Materially Erred and Abused Its Discretion Against

the Manifest Weight of the Evidence When It Failed to Find the Plaintiff-Appellee Had Committed Waste and Financial Misconduct.

The Trial Court Materially Erred and Abused Its Discretion Against the Manifest Weight of the Evidence When It Failed to Make a Distributive Award to Defendant-Appellee-Wife.

**{¶ 75}** Under these assignments of error, Rebecca contends that the trial court erred in failing to make a distributive award.   In the Sixth Assignment of Error, Rebecca relies on R.C. 3105.171(E)(3).   However, this is not the correct subsection of the statute. The case Rebecca cites is a 1988 decision, which quotes from "R.C. 3105.171(E)(3)." *See* Appellant's Brief, p. 26, quoting *Rinehart v. Rinehart*, 4th Dist. Gallia No. 96 CA 10, 1998 WL 282622, *11 (May 18, 1988).   However, R.C. 3105.171 was amended in 2010. *See* Am. Sub. H.B. 238, 2010 Ohio Laws File 37.   At that time, a new subsection (E)(3) was added, and the financial misconduct provision was renumbered as (E)(4).

**{¶ 76}** In the Seventh Assignment of Error, Rebecca relies on R.C. 3105.171(E)(4), which is the correct subsection.   This subsection provides that "[i]f a spouse has engaged in financial misconduct, including, but not limited to, the dissipation, destruction, concealment, nondisclosure, or fraudulent disposition of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property."   According to Rebecca, John engaged in financial misconduct in these ways:  purposely losing his job; letting the marital home go into foreclosure notwithstanding having received $23,800 from selling firearms in September 2016; selling silver and claiming not to know what happened to silver that Rebecca owned; and giving

his daughter a firearm that belonged to Rebecca.[4]

**{¶ 77}** Rebecca raised the issue of fraud and waste at trial, in specific reference to the fact that John allowed the marital residence to go into foreclosure despite having sold guns for $23,800 in September 2016, shortly before he filed for divorce. April 9, 2018 Transcript ("Tr. 6"), p. 61. The trial court did not make a finding on this point. As a result, we assume the trial court rejected the contention. *Dayton Monetary Assoc. v. Becker*, 126 Ohio App.3d 527, 539, 710 N.E.2d 1151 (2d Dist.1998).

**{¶ 78}** The trial court concluded that most guns were John's separate property other than a few valued at a minimal sum ($1,466), which was divided equally. Nonetheless, Rebecca contends that in addition to allowing himself to be fired from his job for something he could easily have avoided, John also dissipated the $23,800 he received for property sold during the marriage, and allowed the marital residence to go into foreclosure. He also retained guns in his possession that he could have attempted to sell which were separate property. An expert valued these guns at more than $21,000.

**{¶ 79}** " 'The financial misconduct statute should apply only if the spouse engaged in some type of wrongdoing (i.e., wrongful scienter).' " *Feldmiller v. Feldmiller*, 2d Dist. Montgomery No. 24989, 2012-Ohio-4621, ¶ 18, quoting *Mantle v. Sterry*, 10th Dist. Franklin No. 02AP-286, 2003-Ohio-6058, ¶ 32. " ' "Typically, the offending spouse will either profit from the misconduct or intentionally defeat the other spouse's distribution of

---

[4] Notably, there was no evidence that the marital home was actually sold at a foreclosure sale. All John indicated at trial was that he failed to make the $750 monthly payments during the divorce action, despite having sold guns for $23,800, and that the bank had filed a foreclosure action.

marital assets." ' * * * Financial misconduct involves some element of profit or interference with another's property rights.' " *Id.*, quoting *Mantle* at ¶ 32. (Other citation omitted.)

**{¶ 80}** "Because financial misconduct involves some element of profit or interference with another's property rights, the time frame in which the alleged misconduct occurs may often demonstrate wrongful scienter." *Hammond v. Brown*, 8th Dist. Cuyahoga No. 67268, 1995 WL 546903, *3 (Sept. 14, 1995). For example, in *Babka v. Babka*, 83 Ohio App.3d 428, 615 N.E.2d 247 (9th Dist.1992), a husband liquidated a joint account just before the parties' divorce. Although the husband testified that he had used the funds to pay marital debts, he could not satisfactorily account for the funds. *Id.* at 436.

**{¶ 81}** The complaining party has the burden of proof, and we review for abuse of discretion. *Brown v. Brown*, 2014-Ohio-2402, 14 N.E.3d 404, ¶ 14 (2d Dist.). The court does not have to find malicious intent; it need only find "that a spouse has engaged in knowing wrongdoing." *Best v. Best*, 10th Dist. Franklin No. 11AP-239, 2011-Ohio-6668, ¶ 21.

**{¶ 82}** Furthermore, courts have found proof of financial misconduct where a spouse has violated the court's restraining orders. *See, e.g., Galloway v. Khan*, 10th Dist. Franklin No. 06AP-140, 2006-Ohio-6637, ¶ 27; *Caron v. Manfresca-Caron*, 10th Dist. Franklin No. 97APF03-438, 1997 WL 723262, *6 (Nov. 20, 1997).

**{¶ 83}** In March 2018, Rebecca filed a motion for contempt, contending, among other things, that John had violated the court's temporary orders by failing to "pay the marital debts for residence and food" as had been their custom, and by dissipating, disposing, or selling real or personal property without her written consent. *See* Doc. #27,

p. 1.[5]   Rebecca presented testimony and evidence about these matters on April 9, 2018, including pictures of very low temperatures in the house, because John would not let her turn on the heat.   For example, at various times on December 16, 2016, the temperature in the house was between 46 and 49 degrees.   *See* Tr. 6 at p. 9 and Ex. A-2.   This was around three months after John had received $23,800 for guns he had sold.   She also testified that he did not buy food for the house and about other ways in which the orders had been violated, including failing to pay the mortgage.

**{¶ 84}** The facts alleged in support of these two assignments of error rely, for the most part, on the credibility determinations of the trial court and the reasonable weight to be given to the uncontested facts. We find that the trial court did not abuse its discretion. Accordingly, the Seventh Assignment of Error will be overruled. The Sixth Assignment of Error is overruled as duplicative.


VIII.   Spousal Support

**{¶ 85}** Rebecca's Eighth Assignment of Error states that:

The Trial Court Materially Erred and Abused Its Discretion Against the Manifest Weight of the Evidence When It Did Not Award Spousal Support to Wife.

**{¶ 86}** According to Rebecca, the trial court erred in not awarding spousal support because John's earnings were below his earning capacity, and Rebecca was dependent on his income, based on the years she was out of the labor force.   Rebecca also contends that the trial court abused its discretion by refusing to consider that she was

---

[5] The trial court never ruled on the contempt motion.

unable to work. Finally, Rebecca contends that the factors supporting an indefinite support award were present, based on the 15-year duration of the marriage.

{¶ 87} R.C. 3105.18(B) allows courts to award spousal support on the request of either party, after the division or disbursement of property has been decided. R.C. 3105.18(C)(1) provides a list of 13 factors the court must consider, and also allows the court to consider "[a]ny other factor that the court expressly finds to be relevant and equitable." R.C. 3105.18(C)(1)(n). The trial court considered the applicable factors but found that no spousal support should be ordered. We review spousal support decisions for abuse of discretion. *Tremaine v. Tremaine*, 111 Ohio App.3d 703, 706, 676 N.E.2d 1249 (2d Dist.1996)

{¶ 88} In view of our prior discussion, the trial court must be reversed on this point. Specifically, where a division of property is remanded for additional findings, the spousal support determination must also be remanded. Spousal support determinations may only be made after the trial court has divided the property. *Carmichael v. Carmichael*, 9th Dist. Wayne No. 11CA0036, 2012-Ohio-5811, ¶ 12. Because we sustained the First and Fifth Assignments of Error concerning the dates applicable to the division of marital property and the division of real estate, the spousal support decision necessarily must be reversed. Accordingly, the Eighth Assignment of Error is sustained, and this matter will be remanded to the trial court for reconsideration of spousal support.

## IX. Discovery Requests

{¶ 89} Rebecca's Ninth Assignment of Error states as follows:

> The Trial Court Materially Erred and Abused Its Discretion Against

the Manifest Weight of the Evidence When It Did Not Order Plaintiff-Appellee to Comply With Discovery Requests

**{¶ 90}** Under this assignment of error, Rebecca contends that the trial court erred by failing to force John to disclose information about his gun ownership and about communication that John received from Fidelity Investments. Rebecca notes that she filed five discovery requests between December 26, 2016 and April 16, 2018, and that the court abused its discretion in denying the latest request (about a Fidelity letter), due to displeasure with Rebecca's counsel.

**{¶ 91}** Civ.R. 33 and 34 allow parties to serve other parties with interrogatories and requests for production of documents. Civ.R. 37(A) further provides that:

> On notice to other parties and all affected persons, a party may move for an order compelling discovery. The motion shall include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make discovery in an effort to obtain it without court action.

**{¶ 92}** If a party fails to supplement earlier responses, the court can impose various sanctions, including "any of the orders listed in Civ.R. 37(B)(1)(a) through (f)." Civ.R. 37(C)(1)(c). One such order is "[s]taying further proceedings until the order is obeyed * * *." Civ.R. 37(B)(1)(d). A trial court's discovery rulings are reviewed for abuse of discretion. *See, e.g., State ex rel. The V Cos. v. Marshall*, 81 Ohio St.3d 467, 469, 692 N.E.2d 198 (1998). After reviewing the record, we find no abuse of discretion.

**{¶ 93}** This action was filed on November 12, 2016 and was at issue on November 22, 2016, when John filed his answer to Rebecca's counterclaim for divorce. The trial

court did not establish discovery deadlines, but both sides filed discovery requests early in the case.   In January 2017, John filed a motion for a protective order, asking that he not be required to respond to Rebecca's first set of interrogatories, or not be required to respond publicly.   The record does not reflect a decision on the motion.

{¶ 94} The first day of the divorce hearing began on July 11, 2017, and Rebecca did not raise any issues about discovery at that time.   She then filed a second set of interrogatories on August 1, 2017, about six weeks before the next hearing, which was to be held on September 11, 2017.   However, Rebecca's counsel did not raise any discovery issues at the September 11 hearing.   See Tr. 2 at p. 5 (where counsel indicated no preliminary issues needed to be addressed.)

{¶ 95} On September 21, 2017, Rebecca filed a motion to compel John to answer the first set of interrogatories that had been filed in December 2016.    Notably, this was a long time after the answers were due.   On September 25, 2017, the trial court ordered John to provide a list of all firearms he had owned since the date of marriage, to provide an explanation of the disposition of the firearms, and to allow Rebecca's expert to inspect all firearms in which John currently had an interest. The court also heard testimony that day regarding the divorce.   This was the fourth day of evidentiary hearings.

{¶ 96} In November 2017, Rebecca filed a notice of appeal from an entry that the court filed concerning the date to be used for determining marital property.   However, in January 2018, we granted John's motion to dismiss the appeal.   After the case returned to the trial court, the next divorce hearing (the fifth) was held on March 12, 2018.   At that time, Rebecca's attorney again told the court that no preliminary matters needed to be discussed.   March 12, 2018 Transcript ("Tr. 5"), p. 7.   Prior to the hearing, however,

Rebecca had filed a motion to compel on March 6, 2018, contending that John had not complied with the trial court's September 25, 2017 entry. In apparent response to the motion, John filed a certificate on March 9, 2018, indicating that he had served Rebecca's attorney with a gun list.

{¶ 97} On March 22, 2018, Rebecca filed a third set of requests for production of documents and interrogatories. John then filed a certificate on March 28, 2018, stating that he had served Rebecca's attorney with a second gun list. This list indicated that John had sold two guns in September 2016 for $23,800. *See* Doc. #35, p. 1. On April 6, 2018, Rebecca filed a fourth request for production of documents, asking for receipts regarding the September 2016 gun sales, along with documentation about where the money had been deposited and proof of what was done with the money.

{¶ 98} At the next hearing (the sixth), which was held on April 9, 2018, Rebecca did not raise any discovery issues. Although the motion to compel had never been addressed, the trial court may have assumed that the March 6, 2018 motion had been resolved by the parties, given that John had provided two additional gun lists, and that Rebecca failed to raise the issue in the April 9, 2018 hearing.

{¶ 99} The seventh and final divorce hearing was scheduled for April 17, 2018. On the day before the hearing, Rebecca filed a fifth request for production of documents, asking for the same information that had been requested on April 6, 2018. However, a new request was added, asking for information about a letter John had received from Fidelity Investments on April 10, 2018. *See* Doc. #39. A copy of the envelope was attached to the request.[6]

---

[6] Only a copy of the envelope was attached. Although the parties were still married and

{¶ 100} At the final hearing, the court inquired about the fifth request for discovery, and Rebecca's attorney indicated that they were still not getting all the information from John. In particular, Rebecca's attorney mentioned the $23,800 in gun sales; the trial court then said that Rebecca's attorney could call John and ask him questions. April 17, 2018 Transcript ("Tr.7), p. 7. The court further stated that it would not require John to respond to the April 16, 2018 discovery request. *Id.* at p. 8. Rebecca's counsel did ask John questions about the gun sales. *Id.* at pp. 36-39.

{¶ 101} During the hearing, Rebecca also testified and identified a copy of the Fidelity envelope. She said it had been delivered to the parties' house a few days after the April 9, 2018 hearing. *Id.* at p. 20 and Ex. FFF. Rebecca further said she believed, after seeing this information, that John had concealed assets. In addition, Rebecca testified that she had asked John about any investments when she gave him the first set of interrogatories in December 2016. *Id.* at p. 21.

{¶ 102} At this hearing, John denied having any current investments with Fidelity. He said he previously had a 401K with Fidelity from 1989 to 2004, and had cashed in the account in either 2007 or 2008. *Id.* at pp. 33-34. John said he had reported this on his 2008 tax returns and claimed that it "probably went into Becky's checking account where money was forwarded into." *Id.* at p. 35. According to John, this money no longer existed. *Id.*

{¶ 103} During cross-examination, Rebecca's attorney questioned John about the Fidelity account. *Id.* at p. 41. John admitted seeing the recent communication from

---

were residing in the same house, John had forbidden Rebecca from opening any mail that was addressed to him.

Fidelity, and stated that "it's still unopened, if it's there." *Id.* As to why Fidelity would be mailing something to him in 2018, John said, "I can answer that this afternoon. I'll go home and open it. I don't know what it is. I haven't seen it." *Id.* at p. 42.

{¶ 104} We note that Rebecca did not certify in the March 6, 2018 motion that she had attempted to informally resolve the discovery dispute. This is a requirement under Civ.R. 37(A).

{¶ 105} Furthermore, the case had been pending for about a year and a half. Counsel had ample opportunity to obtain discovery and file motions to compel, rather than waiting until after several evidentiary hearings had been held. As noted, Rebecca's counsel also often failed to raise issues during hearings, when she could have alerted the court to any problem. As a result, we cannot find an abuse of discretion in connection with the trial court's discovery rulings.

{¶ 106} Our review of the case, which includes all the pleadings and transcripts, reveals that John was evasive about property. For example, an expert that Rebecca hired had to make two trips to the property to evaluate the guns that John currently owned. The extra trip was needed because the expert was only shown six guns during his first visit. September 25, 2017 Transcript ("Tr. 4"), p. 41. When the expert returned, he was able to see the other six guns, plus four Class III (fully automatic) firearms. *Id.* at pp. 58-59. The expert valued the Class III firearms as follows: (1) $6,000 (American 180 drum-fed .22 long rifle); (2) $10,000 (M-1919 A6 Browning with a bipod); (3) $200 (Remington 870 Wingmaster pump action shotgun); and (4) $5,000-$5,500 (Israeli-made 9-millimeter sub-machine gun). *Id.* at pp. 60-62, 64-65, 68-71, and 72-74. The trial court acknowledged John's deceptiveness, finding that John was not credible about financial

matters.   Doc. #41 at p. 2.

{¶ 107} While we do not find an abuse of discretion regarding the discovery orders, the trial court may reconsider evidence about Fidelity Investments since this matter is being remanded for further proceedings.

{¶ 108} Based on the preceding discussion, the Ninth Assignment of Error is overruled.


X.   Expert Fees

{¶ 109} Rebecca's Tenth Assignment of Error states that:

The Trial Court Materially Erred and Abused Its Discretion Against

the Manifest Weight of the Evidence When It Failed to Obligate Plaintiff to

Pay a Portion If Not All of the Gun Expert Appraisal Fees.

{¶ 110} According to Rebecca, the trial court also abused its discretion by failing to order John to pay any part of the gun expert fees.   In this regard, Rebecca contends that the expert appeared for trial, but the court did not let him testify because he had not been shown all the guns.   As a result, the expert had to make a second trip to see additional guns and show up for trial a second time, causing unnecessary fees.   As with all other assignments of error, John has not responded to Rebecca's argument.

{¶ 111} At trial, the expert testified that his time to date would result in a $325 charge.   Tr. 3 at p. 82.   The trial court overruled Rebecca's request for reimbursement of the firearm appraisal fees without specifying a reason.   *See* Doc. #41 at p. 18.

{¶ 112} In divorce cases, "a court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable."   R.C.

3105.73(A). These orders are reviewed for abuse of discretion. *Rucks v. Moore*, 2d Dist. Montgomery No. 27928, 2018-Ohio-4692, ¶ 46. There was no dispute that John caused additional expense by failing to disclose all his guns during the expert's initial visit (which the court had ordered).

**{¶ 113}** Accordingly, the Tenth Assignment of Error is sustained, and this issue will be remanded for further proceedings.

## XI. Amendment of Taxes

**{¶ 114}** Rebecca's Eleventh Assignment of Error states that:

The Trial Court Materially Erred and Abused Its Discretion Against

the Manifest Weight of the Evidence When It Did Not Order That the Parties

Amend Their Federal Income 2016 and 2017 Taxes to Married Filing Jointly.

**{¶ 115}** According to Rebecca, the trial court should have required the parties to amend their 2016 and 2017 tax returns because John's choice to file separately in those years provided him with a refund and left Rebecca with a tax liability. In contrast, filing jointly would have provided both parties with a refund. Furthermore, the parties had always previously filed jointly.

**{¶ 116}** The trial court stated that the tax returns would provide a benefit mostly to Rebecca and concluded that ordering amendment would not be equitable under the circumstances of the case. Doc. #41 at p. 16. The trial court made no other comments that would explain its reasoning. Again, we review the trial court's division of property for abuse of discretion. *Neeley v. Neeley*, 1st Dist. Hamilton No. 8203487, 1984 WL 7058, *2 (Nov. 14, 1984) (discussing amendment of tax return).

{¶ 117} Rebecca presented testimony from a tax expert that if the parties had filed jointly in 2016, they would have received a $1,202 refund. In that year, by filing separately, John received a $1,107 refund on his federal taxes and $202 on his state taxes. However, Rebecca paid $410 in taxes. The tax expert then returned to discuss the 2017 returns. For that year, John improperly filed as a single person and received refunds of $1,297 on his federal taxes and $208 on his state taxes. If John had properly filed his taxes as a married person filing separately, he would have received a $1,122 refund on his federal taxes.

{¶ 118} Rebecca had not yet filed her return at the time of this testimony, but the expert stated that Rebecca would owe $381 for 2017 if she filed separately. If the parties filed jointly, there would have been a refund of $1,382.

{¶ 119} We have sustained the First and Fifth Assignments of Error regarding division of marital property, and this assignment of error is also sustained. The court shall reconsider this issue when it reevaluates the subjects of property division and spousal support.

XII.   Contempt

{¶ 120} Rebecca's Twelfth Assignment of Error states that:

The Trial Court Materially Erred and Abused Its Discretion Against the Manifest Weight of the Evidence When It Did Not Make Any Findings Either Way on Defendant-Appellant's Motion for Contempt.

{¶ 121} Under this assignment of error, Rebecca notes that while the court heard her contempt motion, it erred by failing to make any finding. As noted previously, Rebecca filed a motion for contempt on March 6, 2018. At the March 12, 2018 hearing,

John waived the seven-day requirement for filing motions, and the court indicated that the motion would be heard that day. *See* Tr. 6 at p. 6. Rebecca then testified in detail about various ways in which John had violated the agreed temporary orders of the court. John's testimony failed to address most of the alleged contemptuous actions.

{¶ 122} However, the judgment entry and decree of divorce failed to include any finding about the contempt motion. Where trial courts fail to rule on motions, appellate courts presume that the motions have been overruled. *Becker*, 126 Ohio App.3d at 539, 710 N.E.2d 1151.

{¶ 123} The facts alleged in support of this assignment of error rely, for the most part, on the credibility determinations of the trial court and the reasonable weight to be given to the uncontested facts. We find that the result is not against the manifest weight of the evidence, and, thus, the trial court did not abuse its discretion.

{¶ 124} The Twelfth Assignment of Error is overruled.


XIII. Credibility

{¶ 125} Rebecca's Thirteenth Assignment of Error states as follows:

The Trial Court Materially Erred and Abused Its Discretion Against the Manifest Weight of the Evidence When It Found that Defendant-Appellant Was Not Credible.

{¶ 126} According to Rebecca, a review of the transcript fails to reveal any instances where she disregarded the truth. She therefore contends that the trial court abused its discretion by failing to refer to any instances where her testimony was not credible.

{¶ 127} We have repeatedly said that "[t]rial courts resolve witness credibility and the weight to be accorded to the testimony." *Buckingham*, 2018-Ohio-2039, 113 N.E.3d 1061, ¶ 41, citing *Jenkins v. Jenkins*, 2012-Ohio-4182, 975 N.E.2d 1060, ¶ 18 (2d Dist.). "Because the factfinder * * * has the opportunity to see and hear the witnesses, the * * * decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4.

{¶ 128} In this case, the trial court was able to see and hear the witnesses and was in the best position to decide credibility. Consequently, the Thirteenth Assignment of Error is overruled.

XIV.   Alleged Incorrect Facts

{¶ 129} Rebecca's Fourteenth Assignment of Error states as follows:

The Trial Court Materially Erred and Abused Its Discretion Against the Manifest Weight of the Evidence When It's [sic] Decision Showed Findings of Fact That Were Simply Incorrect.

{¶ 130} In her final assignment of error, Rebecca contends that the trial court's judgment contains incorrect facts.    The incorrect facts that the court allegedly found are: (1) that John was employed at Rollins when, in fact, John testified that he was employed at Springfield Mercy Hospital; (2) that the judgment awarded two motorcycles to John as separate property when John testified that one motorcycle was purchased during the marriage; and (3) that Rebecca asked for attorney fees, when Rebecca had testified that she was not seeking fees.

{¶ 131} Points one and three are correct.  Tr. 7, pp. 25 and 29.  As to the motorcycles, John testified that he purchased one motorcycle in 1981 and did not recall if the other was purchased before or after marriage.  Tr. 1 at pp. 32-33.  However, these errors are irrelevant, because this matter is being reversed and remanded for further proceedings, including the subject of the property division and spousal support.  Accordingly, this assignment of error is overruled.

XV.  Conclusion

{¶ 132} Rebecca's First, Fifth, Eighth, Tenth and Eleventh Assignments of Error are sustained.  The Second, Third, Fourth, Seventh, Ninth, Twelfth, Thirteenth, and Fourteenth Assignments of Error are overruled, and the Sixth Assignment of Error is overruled as duplicative of the Seventh Assignment of Error. The judgment, therefore, is reversed in part and affirmed in part, and this cause is remanded to the trial court for further proceedings consistent with this opinion.

. . . . . . . . . . . .

TUCKER, J., concurs.

FROELICH, J., concurs in part and dissents in part:

{¶ 133} I concur with the majority except for its holding that the trial court's finding regarding John's waste and financial misconduct was not an abuse of discretion. Although the evidence on this issue was confusing, there was sufficient evidence that John's conduct, especially concerning the marital residence, was knowingly done to interfere with Rebecca's distribution of marital assets.

Copies sent to:

James E. Heath
Linda Joanne Cushman
Hon. Thomas J. Capper