[Cite as *Head v. Head*, 2024-Ohio-276.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| ANTHONY T. HEAD | : | |
| | : | |
| Appellant | : | C.A. No. 29846 |
| | : | |
| v. | : | Trial Court Case No. 2020-DR-889 |
| | : | |
| CHINEQUA N. TAYLOR HEAD | : | (Appeal from Common Pleas Court-Domestic Relations) |
| | : | |
| Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on January 26, 2024

. . . . . . . . . . .

THERESA A. BAKER, Attorney for Appellant

TRISHA MARIE DUFF and JAREN A. HARDESTY, Attorneys for Appellee

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Appellant, Anthony Head ("Anthony"), appeals from a final judgment and decree issued in a divorce case involving Appellee, Chinequa Taylor-Head ("Chinequa"). According to Anthony, the trial court abused its discretion in the following ways: (1) failing to require Chinequa to pay one-half of a marital debt to the Internal Revenue Service ("IRS"); (2) failing to award Anthony a 2011 Tahoe automobile; (3) failing to find Chinequa

in contempt and liable for financial misconduct in connection with damage to the marital residence; (4) failing to let Anthony question Chinequa about discrepancies in her income tax returns after she asserted her Fifth Amendment rights; (5) awarding sole custody of the parties' children to Chinequa; and (6) awarding Chinequa the tax exemptions for the parties' two minor children.

{¶ 2} After reviewing the entire record, we find no error or abuse of discretion by the trial court on five assignments of error. However, the court did abuse its discretion in offsetting an eviction judgment that Chinequa paid and in failing to hold her responsible for one-half of the IRS debt. Contrary to the trial court's conclusion, the eviction judgment was a marital debt rather than Anthony's premarital debt. Accordingly, Anthony's first assignment of error will be sustained, and assignments of error two through six will be overruled. The trial court's judgment, therefore, will be affirmed in part and reversed in part. This cause will be remanded to the trial court solely for recalculation of the amounts each party will be credited toward the two debts, as it deems equitable, and for an order for reimbursement as needed.


I.   Facts and Course of Proceedings

{¶ 3} Anthony and Chinequa were married in February 2015 and two children, J.H., and A.H., were born during the marriage. The parties separated around October 2018 following a domestic violence incident. On December 2, 2020, Anthony filed a complaint for divorce, alleging that the children were living with him and that he and Chinequa had lived apart for more than a year. The complaint requested, among other things, that the

court grant temporary and permanent custody of the children to Anthony. On December 9, 2020, the case was assigned to Judge Wood, because the parties were already involved in two domestic violence civil protection order cases before that judge (Case Nos. 2020 CV 1701 and 2020 CV 1731).

{¶ 4} On January 21, 2021, Chinequa filed an answer and counterclaim for divorce. At that time, Chinequa also alleged that the children lived with her and asked for temporary and permanent custody. Chinequa then filed a motion for emergency custody on January 29, 2021. In the motion, she claimed that, after learning of her plans for divorce, Anthony had filed a request for a domestic violence protection order and had provided false information about the children's residence and its condition. The motion further said that Chinequa had filed a cross-petition for a domestic violence protection order based on Anthony's alleged past violence and recent threats of physical harm and that Anthony had prevented her from seeing the children.

{¶ 5} In a supplemental pleading, Chinequa claimed Anthony had threatened to take the children out of state; she therefore asked the court to issue an ex parte emergency order. On January 29, 2021, the court filed an ex parte order granting temporary custody of the children to Chinequa and allowing Anthony standard parenting time so long as he returned the children on time and did not remove them from the state. The court also set a hearing for February 9, 2021.

{¶ 6} Anthony filed an answer to the counterclaim on February 3, 2021. On February 4, 2021, the court issued temporary orders under Civ.R. 75 granting temporary custody to Chinequa and standard parenting time to Anthony in accordance with the ex

parte order. The court also ordered Anthony to pay temporary child support of $1,455.44 per month, plus a two percent processing fee.

{¶ 7} At the February 9, 2021 hearing, Chinequa withdrew her emergency motion due to the temporary orders that had been issued. As a result, Anthony filed motions on February 12, 2021, seeking hearings on the ex parte order and on the temporary custody order. The court then set a hearing on both motions for March 5, 2021. The court converted that hearing partially to a pretrial and appointed Theodore Valley as guardian ad litem ("GAL"), with the GAL report to be due by May 26, 2021. The court also took testimony on March 5, 2021, and continued the hearing to March 26, 2021.

{¶ 8} Before a decision was issued, Anthony filed a motion on April 22, 2021, asking the court to order hair follicle drug testing of both parties. This was followed by Anthony's April 23, 2021 motion for an ex parte order of emergency custody. In the motion, Anthony alleged that Chinequa had been involved in two late-night automobile accidents, the most recent of which had occurred on April 4, 2021, and had resulted in serious injuries to Chinequa. The motion further alleged that Chinequa had tested positive at the hospital for the presence of alcohol, marijuana, and opiates. According to Anthony, Chinequa had concealed the accident from him. Motion for Ex Parte Emergency Temporary Custody (Apr. 23, 2021), p. 3-4. A hearing on this motion was scheduled for May 7, 2021. In addition, on April 26, 2021, the court ordered both parties to immediately submit to a hair follicle drug screen.

{¶ 9} After hearing testimony on two occasions, a magistrate granted Anthony temporary custody of the children on June 8, 2021, and suspended his child support

obligation.   At the time, Chinequa had not complied with the drug testing order, and the magistrate suspended her unsupervised parenting time until further order of the court. The magistrate indicated Chinequa could request parenting time after complying with the drug test order.   Magistrate's Decision (June 8, 2021), p. 3-5.   Although Chinequa filed a motion to set aside the magistrate's decision, she did not file a transcript, and the trial court overruled her objections.   *See* Decision and Judgment (Sept. 1, 2021).

{¶ 10} In the meantime, on July 6, 2021, Anthony had asked for an order allowing him exclusive use of the marital premises; a hearing on the motion was set for September 7, 2021.   On September 1, 2021, Chinequa asked the court to restore unsupervised parenting time, and this matter was set for September 7, 2021, as well.   Anthony then filed a request for drug testing, and on September 7, 2021, the court ordered Chinequa to submit to a drug screen within 24 hours.   On September 9, 2021, an agreed entry was filed allowing Anthony to take exclusive possession of the marital premises on October 20, 2021.   Another agreed entry was filed on October 13, 2021, allowing Chinequa to have unsupervised parenting time according to the court's standard order; she was also ordered to pay $933 per month as child support.

{¶ 11} In December 2021, Anthony filed a motion for contempt regarding alleged damage Chinequa had done to the marital home.   This motion was set for hearing on January 4, 2022, but the date was later vacated, and the motion was scheduled to be heard at the trial, which was set for January 7, 2022.   After being continued twice more, trial was then scheduled to begin on September 12, 2022.

{¶ 12} In the meantime, the court re-appointed Valley as GAL, with a report to be

due on or before September 5, 2022. The trial was again continued in July 2022 and was set for January 17, 2023. At this point, the court appointed a new GAL, David Mesaros, with his report to be submitted by October 10, 2022.

{¶ 13} After holding trial on January 17 and 18, 2023, the court issued a decision on April 25, 2023. A final judgment and decree of divorce was then filed on May 30, 2023. Anthony timely appealed from the judgment and has raised six assignments of error.

## II. Income Tax Debt

{¶ 14} Anthony's first assignment of error states that:

The Trial Court Abused Its Discretion by Not Ordering Chinequa to Pay One-Half (1/2) of the 2019 Federal Income Tax Debt.

{¶ 15} Under this assignment of error, Anthony contends the trial court erred in failing to require Chinequa to pay one-half of a 2019 income tax debt owed to the IRS. According to Anthony, the parties owed the IRS $5,796.26 for a 2019 tax deficiency and Chinequa failed to prove she was not liable for the debt.

{¶ 16} In addressing this point, the trial court credited Chinequa with amounts for which her wages had been garnished. The garnishment related to a 2018 certificate of judgment filed against both Anthony and Chinequa. The court accepted Chinequa's testimony that this was payment for Anthony's premarital debt on an apartment Chinequa did not live in and that the parties had agreed that she would pay this debt in lieu of paying on the tax debt. Decision (Apr. 25, 2023) ("Decision"), p. 3-4.

{¶ 17} "In divorce actions, trial courts have broad discretion in deciding an equitable division of property." *Hornbeck v. Hornbeck*, 2019-Ohio-2035, 136 N.E.3d 966, ¶ 13 (2d Dist.), citing *Berish v. Berish*, 69 Ohio St.2d 318, 319, 432 N.E.2d 183 (1982). "We may modify or reverse the court's decision only for abuse of discretion." *Id*. An abuse of discretion " 'implies that the court's attitude is unreasonable, arbitrary or unconscionable.' " *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). "It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). Decisions are unreasonable if no sound reasoning supports the decision. *Id*. *Accord Aldo v. Angle*, 2d Dist. Clark No. 2009-CA-103, 2010-Ohio-2008, ¶ 33.

{¶ 18} " 'In any divorce action, the starting point for a trial court's analysis is an equal division of marital property.' " *Buckingham v. Buckingham*, 2018-Ohio-2039, 113 N.E.3d 1061, ¶ 66 (2d Dist.), quoting *Daniel v. Daniel*, 139 Ohio St.3d 275, 2014-Ohio-1161, 11 N.E.3d 1119, ¶ 7. "It is axiomatic that an equal division of marital property 'is presumed to be equitable.' " *Id.*, quoting *Fisher v. Fisher*, 2d Dist. Darke No. 2014-CA-6, 2015-Ohio-786, ¶ 6. However, "[i]f an equal division of marital property would be inequitable, the court shall not divide the marital property equally but instead shall divide it between the spouses in the manner the court determines equitable." R.C. 3105.171(C)(1).

{¶ 19} Our court has also said that "[j]oint debts are not property or an interest in property the domestic relations court must equally divide between the spouses." *Maloney v. Maloney*, 160 Ohio App.3d 209, 2005-Ohio-1368, 826 N.E.2d 864, ¶ 48 (2d Dist.), citing R.C. 3105.171(B). "They represent merely a charge against the marital property that the court divides. The court may then order one of the parties to pay some or all of the joint debt out of his or her share of marital property or out of the separate property disbursed to that spouse. The court does not abuse its discretion by allocating the debts between the parties on an unequal basis, so long as the allocation is equitable." *Id.*

{¶ 20} As indicated, Anthony contends the trial court erred in failing to order Chinequa to pay half of a debt the parties owed for their 2019 federal tax return, which was filed jointly. At trial, Anthony testified that he had paid $2,500 toward the debt and that $3,529.05, plus interest from June 2022, remained due. Trial Transcript ("Tr.") at 23, 24, and 27, and Plaintiff's Exs. 2 and 3.

{¶ 21} Chinequa testified at trial that beginning in November 2018, her wages were garnished on eight to ten occasions in order to pay off a $4,000 debt Anthony owed on an apartment he lived in before their marriage. Tr. at 264-265, and Defendant's Ex. RR (Chinequa's pay slip for the period ending October 27, 2018, which showed a garnishment payment of $561.43 to "DAY-CRT"). Chinequa further stated that she and Anthony had an agreement, essentially, that Anthony would pay her back for that judgment by paying the debt owed to the IRS. Tr. at 263 and 265. Anthony testified that the parties agreed to each pay half of the IRS debt and that he had reminded

Chinequa of that fact. Tr. at 24-26 and Plaintiff's Ex. 50 (Our Family Wizard message dated December 18, 2021).

{¶ 22} However, while the court accepted Chinequa's testimony that the debt she paid was for Anthony's premarital debt, Chinequa's testimony was factually incorrect.[1] According to the testimony at trial, the parties purchased a home on Dorset Avenue and closed on that property in the first week of January 2018. Tr. at 46, 221, and 286. According to Chinequa, the parties had previously lived at an address on River's Edge Boulevard, had vacated that property early to move into the Dorset home, and had paid the River's Edge lease off before they left. Tr. at 306-307. When Chinequa was shown a copy of a certificate of judgment at trial (Plaintiff's Ex. 61), she testified that this was for a different property on which Anthony had abandoned a lease before they were married in 2015. Chinequa further said that she had had no opportunity to participate in those proceedings and that the landlord had received a default judgment because the hearing on the case occurred while Anthony was incarcerated in September 2018 on a domestic violence charge. Therefore, Anthony was unable to appear for the hearing. Tr. at 263-265 and 306-307.

{¶ 23} Exhibit 61 was a certificate of judgment that was filed on July 6, 2018, against both Anthony and Chinequa for $4,207.67, with interest of four percent per annum and $247 in court costs. The certificate was based on a judgment issued against them on June 1, 2018. The judgment in question was issued in Dayton M.C. Case No. 2018-CVG. *Id.*

---

[1] Chinequa subsequently express uncertainty about whether the garnishment was for the premarital property or a property the parties rented after their marriage. Tr. at 306.

**{¶ 24}** We have consulted the online docket for that case, which was a forcible entry and detainer action filed against Anthony on February 16, 2018, by Dix Road Property Management, LLC.[2] Chinequa was added as a party on February 20, 2018, and the location of the requested eviction was 5318 Rivers Edge Blvd., Dayton, Ohio. Service on both parties was successful on February 22, 2018, judgment was granted against them on March 16, 2018, after both parties failed to appear, and a writ of restitution was filed on March 23, 2018. Subsequently, on May 29, 2018, Dix filed a motion for default judgment on damages, and on June 11, 2018, the court granted a default judgment against both Anthony and Chinequa.

**{¶ 25}** The certificate of judgment was filed on July 6, 2018, and on October 4, 2018, Dix filed for a wage garnishment against Chinequa. On October 10, 2018, the municipal court issued a wage execution to Trotwood-Madison City Schools (where Chinequa was employed), and the certified mail receipt was returned on October 22, 2018. Then, on November 20, 2018, the school paid $561.43 to the court, which is consistent with the amount shown on Defendant's Ex. RR (Chinequa's pay slip). From that time through March 6, 2019, a total of $4,639.31 was garnished from Chinequa's wages and was paid into the court to satisfy the debt.

**{¶ 26}** In light of the above discussion, it is obvious that the judgment was taken in June 2018, well before Anthony was incarcerated, that both parties had an opportunity to contest the debt, and that the amount Chinequa paid was not for a premarital debt.

---

[2] "Under well-recognized law, we may take judicial notice of public records and judicial opinions that can be accessed via the internet." *Clark v. Beyoglides*, 2021-Ohio-4588, 182 N.E.3d 1212, ¶ 6, fn.1 (2d Dist.), citing *True Care Early Learning Ctr. v. Ohio Dept. of Job & Family Servs.*, 2020-Ohio-954, 152 N.E.3d 1017, ¶ 24, fn.5 (2d Dist.).

Rather, it was for a property the parties rented on River's Edge, where Chinequa admitted she had lived during the marriage.

{¶ 27} The trial court's basis for rejecting Anthony's claim for the tax debt was due to an incorrect belief that the garnished amount was for Anthony's premarital debt. As a result, the court's decision was not based on sound reasoning.

{¶ 28} Accordingly, the first assignment of error is sustained. This matter will be remanded so the trial court can adjust the amount to be paid, i.e., the court should add the amount owed for the income tax debt and the municipal court judgment that Chinequa paid. The court must then divide the total amount as it deems equitable, credit each party with the amount paid toward his or her share of the total debt, and order reimbursement as needed.

III. Disposition of 2011 Tahoe Automobile

{¶ 29} Anthony's second assignment of error states that:

The Trial Court Abused Its Discretion in Not Awarding Anthony the

2011 Tahoe Automobile.

{¶ 30} Under this assignment of error, Anthony contends that the trial court erred in failing to award him a 2011 Tahoe automobile that the parties owned. According to Anthony, the court awarded Chinequa the vehicle even though she had other vehicles available to her and had failed to provide proof, as requested, that her other vehicles were not in working condition.

{¶ 31} In its decision, the court awarded Anthony a 2011 Volvo, awarded Chinequa

the 2011 Tahoe, and ordered each party to pay the other for half the value of the car they received. Because the Tahoe was worth more than the Volvo, Chinequa had to pay Anthony more to offset the difference. *See* Decision at p. 2-3. In the decision, the court also noted that the 2011 Tahoe was the only operational vehicle Chinequa had in her possession. *Id.* at p. 3. Again, we review the court's property division for abuse of discretion, i.e., generally considering whether the court's decision was based on unsound reasoning. *AAAA Ents.*, 50 Ohio St.3d at 161, 553 N.E.2d 597. Having reviewed the entire record, including the pleadings, transcripts, and exhibits, we find no abuse of discretion.

{¶ 32} At trial, Anthony testified that he wanted the Tahoe because it was larger and was a work truck. He also said Chinequa had several other cars, including a Chevy Impala, two 2011 Cadillac SRXs, and a Nissan Ultima. Tr. at 40-41. Anthony then stated that the Impala was inoperable. Tr. at 42. After this statement, the court and attorneys conferred. The court then remarked that because three of the four cars (the Cadillacs and the Ultima) were no longer in Chinequa's possession, no offset was requested for these cars. The court also said Chinequa would provide documentation indicating that two cars had been totaled and taken by Sandy's Towing. Tr. at 42-43.

{¶ 33} Anthony contends that the record was insufficient because Chinequa never provided the documentation. Appellant's Brief at p. 16. The record is silent regarding whether documentation was provided. However, the divorce hearings took place in mid-January 2023, and the court's decision was not filed until April 5, 2023. The final divorce decree was not filed until nearly six weeks later, on May 30, 2023. Anthony therefore

had ample time to raise the documentation issue with the trial court if he was dissatisfied. Having failed to do so, he has waived this point. A fundamental rule is that "an appellate court will not consider any error which could have been brought to the trial court's attention, and hence avoided or otherwise corrected." *Schade v. Carnegie Body Co.*, 70 Ohio St.2d 207, 210, 436 N.E.2d 1001 (1982).

{¶ 34} Even if Anthony had not waived the issue, the record contains evidence supporting the court's decision. First of all, Anthony never offered any evidence that Chinequa had three cars available to her other than his statement. Certainly, he had the ability to obtain discovery on this point or to subpoena records from the Ohio Bureau of Motor Vehicles.

{¶ 35} Second, in the motion for emergency ex parte custody of the children in April 2021, Anthony referenced two police reports indicating that a 2011 Cadillac SRX registered to Chinequa had been involved in accidents that would have caused substantial damage. *See* Motion for Ex Parte Temporary Custody (April 23, 2021), p. 2-3. The first alleged accident occurred on February 13, 2021, and the second occurred on April 4, 2021. *Id.*

{¶ 36} At the end of trial, the court admitted all the parties' exhibits. Tr. at 354. Included in Chinequa's exhibits were police reports for dates corresponding with the accidents alleged in Anthony's custody motion. *See* Defendant's Exs. EE and FF. These documents (which were not identified at trial or authenticated) appeared to show the following matters. Ex. EE described an accident on February 13, 2021, that was reported to have caused minor damage to a 2011 Cadillac registered to Chinequa. The

car was towed by Sandy's Towing. Ex. EE at p. 2. Ex. FF described another accident on April 4, 2021, involving the same car, and the damage was reported as disabling. Ex. FF at p. 1. This is the date of the accident in which Chinequa received serious injuries. Tr. at 238-239. Therefore, this evidence appeared to support Chinequa's statement that this vehicle (a 2011 Cadillac) was no longer in her possession.

{¶ 37} In any event, we fail to see the relevance of these vehicles, since Anthony agreed at trial that he would not seek an offset. Tr. at 43. Even if this were otherwise, in making a property division, the trial court could reasonably allow each party one marital vehicle, and therefore it did not act unreasonably or arbitrarily. We also note that Anthony had another vehicle, a 2001 Volvo, that he had purchased before the marriage. At trial, Chinequa agreed he could retain that vehicle. Tr. at 36.

{¶ 38} Based on the preceding discussion, the second assignment of error is overruled.

IV. Damage to Marital Premises

{¶ 39} Anthony's third assignment of error states that:

The Trial Court Abused Its Discretion in Not Finding Chinequa in Contempt for the Damages to the Marital Residence and in Not Finding that Chinequa Had Engaged in Financial Misconduct in the Dissipation and Destruction of the Marital Residence Asset.

{¶ 40} Under this assignment of error, Anthony challenges the trial court's decision on two points: (1) the court's failure to find Chinequa in contempt for violating a restraining

order prohibiting her from damaging marital assets; and (2) the court's failure to find that Chinequa engaged in marital misconduct by dissipating the value of and destroying the marital residence.

**{¶ 41}** In its decision, the trial court found that Anthony had failed to meet his burden regarding the motion to show cause. Decision at p. 6. The court also found Chinequa was not responsible for paying Anthony for any damages to the marital real estate. *Id.* at p. 7-8. We will consider the contempt issue first.

## A.  Contempt

**{¶ 42}** "Contempt is defined in general terms as disobedience of a court order." *State ex rel. Corn v. Russo*, 90 Ohio St.3d 551, 554, 740 N.E.2d 265 (2001). "Civil contempt sanctions are designed for remedial or coercive purposes and are often employed to compel obedience to a court order. * * * Thus, civil contempts are characterized as violations against the party for whose benefit the order was made." (Citation omitted.) *Id.* at 554-555. "A prima facie case of contempt is made by establishing a prior court order and a violation of its terms." *Martin v. Martin*, 179 Ohio App.3d 805, 2008-Ohio-6336, 903 N.E.2d 1243, ¶ 24 (2d Dist.), citing *Nielsen v. Meeker*, 112 Ohio App.3d 448, 679 N.E.2d 28 (8th Dist.1996). " 'The burden then shifts to the nonmoving party to establish a defense for noncompliance.' " *Schutz v. Schutz*, 2017-Ohio-695, 85 N.E.3d 481, ¶ 52 (2d Dist.), quoting *Wolf v. Wolf*, 1st Dist. Hamilton No. C-090587, 2010-Ohio-2762, ¶ 4.

**{¶ 43}** Contempt findings "must be supported by clear and convincing evidence."

*Martin* at ¶ 24, citing *Dozer v. Dozer*, 88 Ohio App.3d 296, 302, 623 N.E.2d 1272 (4th Dist.1993). "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

**{¶ 44}** We review contempt orders for abuse of discretion. *State ex rel. Cincinnati Enquirer v. Hunter*, 138 Ohio St.3d 51, 2013-Ohio-5614, 3 N.E.3d 179, ¶ 21. This review is "highly deferential." *Id.* As noted, an abuse of discretion most often means the trial court's decision was based on unsound reasoning. *AAAA Ents.*, 50 Ohio St.3d at 161, 553 N.E.2d 597.

**{¶ 45}** In discussing the alleged damage to the marital residence, the court found that Chinequa and her mother gave more credible testimony than Anthony. Decision at p. 8. While the court made this comment in the context of its discussion of the marital residence's dissipation or destruction, the subject matter of the contempt motion was the same, and the court's credibility finding equally applies here.

**{¶ 46}** Under well-established law, appellate courts defer to a fact-finder's credibility decision. *E.g., In re J.Y.*, 2d Dist. Miami No. 2007-CA-35, 2008-Ohio-3485, ¶ 33. "The 'rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the

credibility of the proffered testimony.' " *Id.*, quoting *Seasons Coal Co., Inc. v. City of Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

{¶ 47} In the case before us, the parties' testimony about the marital residence's condition was directly opposed. The property was purchased in January 2018, and the parties separated around October 2018, due to accusations of domestic violence against Anthony. Anthony was arrested and jailed briefly, and charges were filed against him in Vandalia Municipal Court. Eventually, Anthony pled guilty to a charge of attempted assault, and he was placed on probation, with one condition being that he not return to the marital residence for a year. Tr. at 46-48. The parties made attempts to reconcile between October 2018 and November 2020, including times when Chinequa came to Anthony's apartment and stayed with him and the children. They also had a standing Sunday date where they spent time together with the children. Tr. at 47-48 and 234-235. However, according to Chinequa, despite these reconciliation attempts, Anthony would then do something violent and she could not trust him. Tr. at 234.

{¶ 48} Before Anthony regained possession of the martial home in October 2021, the last time he had been there was in November 2020, i.e., shortly before he filed for divorce. Tr. at 68. According to Anthony, the house was disheveled and dirty at that time but had no damage other than some holes in the door of one of the children's bedrooms. Tr. at 69-71. Anthony testified that he had learned the children had been home alone for a week (with siblings) and that, when he arrived, the condition of the house was filthy, there was no food, and the house temperature was only 54 degrees. Tr. at 102-103. Anthony then called Children Services, which investigated. Tr. at 236. As

noted, Anthony filed for divorce shortly thereafter.

{¶ 49} In contrast, Chinequa testified that she had been shopping at Costco that day in November 2020 and, when she arrived home, her teenage son was out front, crying. Anthony had kicked in the front French doors to the house and had also kicked in the basement door. Stuff had been dumped all over and there was trash on the floor. At that point, Chinequa texted and called Anthony, saying she could not believe he had done this when she was thinking about letting him move back in. Tr. at 236-237. Children's Services came to the home for a few visits, asked the children some questions, and closed the case. Tr. at 238.

{¶ 50} After the complaint for divorce was filed in December 2020, Chinequa received temporary custody of the children on January 29, 2021. She and the children continued to live in the marital home until April 4, 2021, when Chinequa sustained serious injuries in the auto accident. Tr. at 203. After being in the hospital and rehab for about two weeks, she tried to live in the marital home but could not easily navigate the layout because she was in a wheelchair. Tr. at 190, 239, and 279-280. Thereafter, no one lived in the home every day between April and October 20, 2021, when Anthony took over possession of the house. Tr. at 280.

{¶ 51} Anthony submitted pictures of the house as it had appeared when it was advertised for sale online prior to their purchase of the home. *See* Tr. 52, 137-138, and 225, and Plaintiff's flash drive. These pictures showed a very attractive home. According to Chinequa, when they moved in, the house did not look the same, and there was more work to do than they had expected. The toilets immediately began backing up

due to clay pipes that needed to be replaced at an estimated cost of $15,000. As a result, two of the four bathrooms could not be used during the entire time she lived there. Tr. at 225-226. Ornate rugs that had covered soiled rugs had also been removed by the time they moved in. *Id.*

{¶ 52} The house was equipped with a low-voltage electrical system and, when storms occurred, half the house would not have electricity, the basement would flood, and one furnace would go off because the motherboard was flooded. The other furnace never worked. Tr. at 226. After a few storms, the parties realized they would need to get the roof repaired. Tr. at 253.

{¶ 53} In May 2019, a tornado damaged the outside of the house, loosening shingles. In addition, a tree fell in the front, blocking the front door and damaging the roof. A mudslide occurred and the basement was flooded, causing the low voltage electricity not to come on. There was also damage in the backyard, including a tree that fell where the HVAC system connected to the house. The storm additionally damaged glass in the back, where patio furniture had blown against it and cracked the glass. Tr. at 232-233, 251, and 254. Chinequa testified that Anthony did not allow her to make an insurance claim for the damage. However, Anthony denied this and said he told her to make a claim. Tr. at 136-137, 163, 233, and 294-295. Anthony said he did not make a claim because Chinequa was living in the house. Tr. at 136.

{¶ 54} While Anthony acknowledged tornado devastation had occurred in the area in 2019, he claimed their house had not been heavily damaged. Tr. at 136. He stated the damage was minimal because the tornado was a mile away; he also denied that the

roof condition worsened or that one of the furnace thermostats did not work. Tr. at 140.

{¶ 55} Both Chinequa and her mother, Tiffany, testified that they had cleaned the house when Chinequa vacated it in October 2021, and the house did not look like the pictures Anthony presented at trial. Tr. at 190-193, 195, 251-253, and 256-257. Tiffany stated that the house was not pristine, but it could not be, because they had left Anthony's belongings there. Tr. at 193. Chinequa claimed Anthony had staged the pictures as another ploy. Tr. at 256-257. According to Chinequa, Anthony had threatened to take everything away from her if she left him and had said that he was going to make sure she did not have her house, her children, her money, and her freedom. Tr. at 235.

{¶ 56} Anthony testified at length about the damaged condition of the property when he took possession on October 20, 2021, and the cost it would take to clean and repair the house. Tr. 50-80, and 101. Pictures and video contained on a flash drive were identified and submitted at trial. Tr. at 52-68 and 354 (and listed on Anthony's Exhibit List as Exs. 34 and 48(a), (b), and (c)). Anthony denied having caused any damage to the property, denied there were electrical problems after the house was purchased, denied that rugs had been removed and the carpet was soiled, denied that the home had lighting issues due to the low voltage electricity, and denied that plumbing issues existed. Tr. at 138-139.

{¶ 57} Anthony stated that he had asked the Harrison Township Police to send an officer to do a walk-through with him on October 20, 2021, before he took possession. Tr. at 50-51. A friend, Mengestu Daisney, also accompanied Anthony that day and took video of the damage. At trial, Daisney verified the damage shown on the pictures and

stated that he and Anthony had arrived around 8:00 a.m. and waited until a police officer came before they entered the house.   Tr. at 317-321.

**{¶ 58}** Anthony did not call the officer to testify at trial, but Ex 34(a) (not identified, authenticated, or discussed at trial, but admitted without objection) appears to be an October 20, 2021 "Incident Details Report" from the Harrison Township Police Department.   The report indicates that officers were present at the Dorset home from around 8:30 a.m. to 9:05 a.m. that day.

**{¶ 59}** Given the widely varying testimony from both Anthony and Chinequa, we cannot say the trial court abused its discretion by failing to hold Chinequa in contempt. The trial court was in the best position to observe the witnesses and judge their credibility, and we must defer to the trial court in this regard.

## B.   Dissipation or Destruction of Property

**{¶ 60}**   R.C. 3105.171(E)(1) allows a court to "make a distributive award to facilitate, effectuate, or supplement a division of marital property.   The court may require any distributive award to be secured by a lien on the payor's specific marital property or separate property."   Under R.C. 3105.171(E)(4), "[i]f a spouse has engaged in financial misconduct, including, but not limited to, the dissipation, destruction, concealment, nondisclosure, or fraudulent disposition of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property."

**{¶ 61}** " 'The financial misconduct statute should apply only if the spouse engaged in some type of wrongdoing (i.e., wrongful scienter).' "   *Feldmiller v. Feldmiller*, 2d Dist.

Montgomery No. 24989, 2012-Ohio-4621, ¶ 18, quoting *Mantle v. Sterry*, 10th Dist. Franklin No. 02AP-286, 2003-Ohio-6058, ¶ 32. " 'Typically, the offending spouse will either profit from the misconduct or intentionally defeat the other spouse's distribution of marital assets.' * * * Financial misconduct involves some element of profit or interference with another's property rights." *Id.*, quoting *Mantle* at ¶ 32. (Other citation omitted.)

{¶ 62} "The complaining party has the burden of proof, and we review for abuse of discretion." *Hornbeck,* 2019-Ohio-2035, 136 N.E.3d 966, at ¶ 81, citing *Brown v. Brown*, 2014-Ohio-2402, 14 N.E.3d 404, ¶ 14 (2d Dist.). "The court does not have to find malicious intent; it need only find 'that a spouse has engaged in knowing wrongdoing.' " *Id.*, quoting *Best v. Best*, 10th Dist. Franklin No. 11AP-239, 2011-Ohio-6668, ¶ 21.

{¶ 63} For the reasons previously discussed, the trial court did not abuse its discretion by failing to find that Chinequa had committed financial misconduct. The parties' testimony widely diverged, and the court was in the best position to assess their credibility. Because the court found the testimony of Chinequa and her mother to be more credible, we must defer to the court's decision.

{¶ 64} Accordingly, the third assignment of error is overruled.

V. Alleged Income Discrepancies

{¶ 65} Anthony has combined his discussion of the fourth and fifth assignments of error, and we will do the same. These assignments of error, respectively, state that:

> The Trial Court Abused Its Discretion in Not Permitting Anthony to
> Question Chinequa With Regard to Her Income Discrepancies in the Years

2019 and 2020 and Her Failure to Disclose Income, All Going to Chinequa's Overall Credibility and Fitness for Custody of the Minor Children.

The Trial Court Abused Its Discretion in Granting Custody of the Children to Chinequa.

{¶ 66} Under these assignments of error, Anthony argues, first, that R.C. 3105.171(E)(3) imposes an obligation on courts to require parties to disclose all their income, which Chinequa did not do.  Anthony further contends that the trial court erred in allowing Chinequa to assert Fifth Amendment rights when she was questioned about Paycheck Protection Program ("PPP") loans she obtained for her separate business, Taylorized Educational Consultation, LLC ("TEC").  According to Anthony, these matters bore on Chinequa's credibility and fitness to care for the children.  As pertinent to the custody issue, Anthony also contends the court failed to consider all the factors in R.C. 3109.04(F), including the children's adjustment to their current home, the mental and physical health of both parties, and relevant factors like concerns over Chinequa's leaving the children with her teenage children and Chinequa's lack of interest in J.H.'s school activities.

{¶ 67} Again, we review decisions on property division for abuse of discretion. *Hornbeck*, 2019-Ohio-2035, 136 N.E.3d 966, at ¶ 13.  The same standard applies to custody decisions.  *E.g., Booth v. Booth*, 44 Ohio St.3d 142, 144, 541 N.E.2d 1028 (1989).

A.  Failure to Disclose Income

{¶ 68} R.C. 3105.171(E)(3) states: "The court shall require each spouse to disclose in a full and complete manner all marital property, separate property, and other assets, debts, income, and expenses of the spouse." "If a spouse has substantially and willfully failed to disclose marital property, separate property, or other assets, debts, income, or expenses as required under division (E)(3) of this section, the court may compensate the offended spouse with a distributive award or with a greater award of marital property not to exceed three times the value of the marital property, separate property, or other assets, debts, income, or expenses that are not disclosed by the other spouse." R.C. 3105.171(E)(5). "A domestic relations court has broad discretion in determining whether a spouse has failed to disclose marital property during a divorce or otherwise committed financial misconduct." *Baronzzi v. Gamble*, 2023-Ohio-894, 210 N.E.3d 677, ¶ 36 (7th Dist.). Therefore, we again review for abuse of discretion.

{¶ 69} As a preliminary point, if Anthony had complaints about Chinequa's failure to disclose items like PPP applications, he could have filed a motion to compel discovery. However, he failed to do so. Furthermore, the PPP loans or income were irrelevant, because the parties stipulated at the beginning of trial that Chinequa was the sole owner of TEC and would retain it. Likewise, Anthony was the sole owner of his own business (The Chicken Spot, LLC), and would retain it. Tr. at 5-6. Both parties also obtained loans during the pendency of the divorce proceedings. For example. Anthony obtained COVID PPP loans that were forgiven as well as a $367,000 SBA loan for his business that was not subject to being forgiven. Tr. at 17-19 and Plaintiff's Ex. 52. Likewise, Chinequa obtained PPP loans for TEC during the proceedings. Tr. at 27-31 and

Plaintiff's Exs. 14 and 15. Because the parties signed the loan applications on their own behalf, and were individually liable, and retained their own businesses, information on this point was irrelevant as far as property division was concerned.

{¶ 70} During trial, Anthony implied that Chinequa had committed fraud regarding her PPP loans by overstating her prior revenue from TEC (which was the basis for the loans). Tr. at 117-118. It is true that when Anthony's counsel asked Chinequa about the PPP loan, she asserted her rights under the Fifth Amendment to the U.S. Constitution. Tr. at 289-290. In objecting to further questioning, Chinequa's attorney stated that they had no knowledge of any criminal investigation of the PPP loans, but in case there were one, he could not have Chinequa testify about this matter. The court sustained the objection on this basis. *Id*.

{¶ 71} We review decisions admitting or excluding evidence for abuse of discretion. *E.g., Beard v. Meridia Huron Hosp.*, 106 Ohio St.3d 237, 2005-Ohio-4787, 834 N.E.2d 323, ¶ 20. After review, we find no abuse of discretion.

{¶ 72} "The protections of the Fifth Amendment apply in any type of proceeding – civil, criminal, administrative, investigatory, or adjudicatory – to the extent that compelled testimony 'may tend to incriminate' the witness in a future criminal proceeding." *Sojic v. Karp*, 2015-Ohio-3692, 41 N.E.3d 888, ¶ 29 (2d Dist.), citing *Cincinnati v. Bawtenheimer*, 63 Ohio St.3d 260, 264, 266, 586 N.E.2d 1065 (1992). "In this context, 'incrimination' means not only evidence that would directly support a criminal conviction, but 'information which would furnish a link in the chain of evidence that could lead to prosecution, as well as evidence which an individual reasonably believes could be used against him in a

criminal prosecution.' " *Id.*, quoting *Maness v. Meyers*, 419 U.S. 449, 461, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975). Therefore, Chinequa was entitled to assert the privilege, and the trial court reasonably prohibited further questioning. Again, there was no need for this testimony on the merits, as the parties had already agreed to retain their own businesses (and the attached consequences, if any).

{¶ 73} The only purpose for this testimony may have been to impugn Chinequa's credibility. However, as noted, the court found Chinequa credible. The court also made the following remarks on this subject:

> Further, the court finds it problematic that Anthony, Sr. has been indicating since the inception of this litigation that Chinequa would ultimately be charged by the FBI and the law enforcement for legal [sic] activities, and that none of this has happened to date. It would appear that Anthony, Sr. had no basis whatsoever for making these allegations.

Decision at p. 16.

{¶ 74} The court's comments are consistent with Chinequa's testimony about Anthony's threats. Again, the trial court was in the best position to assess credibility, and we defer to the court's findings.

### B. Custody of the Children

{¶ 75} R.C. 3109.04(B)(1) states that "[w]hen making the allocation of the parental rights and responsibilities for the care of the children under this section in an original proceeding * * *, the court shall take into account that which would be in the best interest

of the children." R.C. 3109.04(F)(1) further provides a list of factors to consider in deciding the children's best interest.

{¶ 76} Concerning initial custody allocation under R.C. 3109.04(F)(1), while the factors are " 'helpful to a reviewing court, there is no requirement that a trial court expressly and separately address each best-interest factor. * * * Absent evidence to the contrary, an appellate court presumes that the trial court considered the relevant statutory factors.' " *Sivertsen-Kuhn v. Kuhn*, 2d Dist. Greene No. 2019-CA-17, 2019-Ohio-3525, ¶ 17, quoting *Wise v. Wise*, 2d Dist. Montgomery No. 23424, 2010-Ohio-1116, ¶ 5. Here, the trial court specifically stated that it had considered the statutory factors in R.C. 3109.04. Decision at p. 15. There is no evidence to the contrary. In fact, the court's discussion was very thorough. *Id.* at 9-17.

{¶ 77} According to Anthony, the court's custody decision was against the manifest weight of the evidence. Appellant's Brief at p. 24. We disagree.

{¶ 78} " '[I]n order for an appellate court to reverse a decision as against the manifest weight of the evidence in a civil context, the court must determine whether the trier of fact, in resolving evidentiary conflicts and making credibility determinations, clearly lost its way and created a manifest miscarriage of justice.' " *Brewer v. Dick Lavy Farms, L.L.C.*, 2016-Ohio-4577, 67 N.E.3d 196, ¶ 46 (2d Dist.), quoting *Alh Properties, P.L.L. v. Procare Automotive Serv. Sols., L.L.C.*, 9th Dist. Summit No. 20991, 2002-Ohio-4246, ¶ 12. " '[M]anifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion * * *." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19.

**{¶ 79}** The court in *Eastley* further stressed that:

In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact.

"[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * *

"If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."

*Eastley* at ¶ 21, quoting *Seasons Coal Co.,* 10 Ohio St.3d at 80, 461 N.E.2d 1273, fn. 3. (Other citation omitted.)

**{¶ 80}** In granting custody to Chinequa, the court relied on several factors. These included the fact that Chinequa had been the primary caretaker for the children for much of their lives; the recommendations of both GALs; the fact that Chinequa had a three-bedroom residence while Anthony had only a one-bedroom apartment where the children lacked their own bedroom; the parties' inability to cooperate in shared parenting; prior incidents of violence by Anthony and his conviction for a misdemeanor related to domestic violence; and Anthony's unfounded accusations against Chinequa. Decision at p. 13, 15, and 16.

**{¶ 81}** The record supports the trial court's decision. Chinequa's testimony

included accounts of some harrowing violence, including a gun incident in the marital home involving Anthony and Chinequa's teenaged children; Anthony's shooting of a gun through the headboard of their bed while he and Chinequa were arguing and she was breastfeeding one of the children; Anthony's assault of Chinequa in their car and his reckless driving in connection with that incident; and Anthony's suspension from his teaching position due to his actions during a school lockdown. Tr. at 205-206, 213-217, 220, and 227-232. Chinequa also testified as to Anthony's intimidation and attempts to control her actions and finances. Tr. at 224, 234, 235-236, 242, 247, 249-251, and 270-272. Anthony's response to Chinequa's testimony was either to minimize his actions or deny that various events, like the bedroom shooting episode, occurred.

{¶ 82} In making its decision, the trial court noted most of the things Anthony mentions in his brief, including Anthony's temporary custody of the children for a time during the litigation, J.H.'s progress at school, Chinequa's health issues, and so forth. Decision at p. 9-10. The court also discussed the parties' testimony at length and concluded that Chinequa should have custody and that Anthony should have parenting time consistent with the standard order. The court did increase Anthony's parenting time in an effort to minimize the parties' interactions with each other. *Id*. at p. 9-16.

{¶ 83} As noted, the court found Chinequa more credible than Anthony, and we defer to the court's credibility conclusions. Accordingly, the fourth and fifth assignments of error are without merit and are overruled.

VI. Tax Exemptions

**{¶ 84}** Anthony's sixth and final assignment of error states that:

> The Trial Court Abused Its Discretion by Awarding Chinequa the Tax
>
> Exemptions for the Parties' Minor Children Every Year.

**{¶ 85}** Under this assignment of error, Anthony contends that the trial court abused its discretion in awarding Chinequa tax exemptions for both children.  According to Anthony, the court failed to consider any factors related to net tax savings and simply made a blanket statement that its decision would be in the children's best interest.

**{¶ 86}** R.C. 3119.82 outlines provisions courts are to follow in designating which parent will be allowed tax exemptions for minor children.  As pertinent here, the statute states that:

> If the parties do not agree, the court, in its order, may permit the parent who
>
> is not the residential parent and legal custodian to claim the children as
>
> dependents for federal income tax purposes only if the court determines
>
> that this furthers the best interest of the children * * *.  In cases in which the
>
> parties do not agree which parent may claim the children as dependents,
>
> the court shall consider, in making its determination, any net tax savings,
>
> the relative financial circumstances and needs of the parents and children,
>
> the amount of time the children spend with each parent, the eligibility of
>
> either or both parents for the federal earned income tax credit or other state
>
> or federal tax credit, and any other relevant factor concerning the best
>
> interest of the children.

**{¶ 87}** The trial court noted the presumption for custodial parents to receive tax

exemptions and remarked that Anthony had failed to demonstrate that awarding him the tax exemption would be in the children's best interest. Decision at p. 19.

{¶ 88} We review tax exemption decisions for abuse of discretion. *Baker v. Baker*, 2013-Ohio-1816, 991 N.E.2d 717, ¶ 47 (2d Dist.), citing *In re Custody of Harris*, 168 Ohio App.3d 1, 2006-Ohio-3649, 857 N.E.2d 1235, ¶ 55 (2d Dist.). In *Baker*, no abuse of discretion in allocation was found where the parties had given the trial court evidence only as to their gross incomes. *See also Dunn v. Dunn*, 2d Dist. Clark No. 2005-CA-104, 2006-Ohio-4649, ¶ 17 (noting that "[a]lthough the trial court must consider 'any relevant factor' in making its determination, R.C. 3119.82 does not require the trial court to consider evidence that is not in the record before the court. In other words, a party cannot complain that the trial court erred in not considering a relevant factor when neither party offered admissible evidence relating to that factor.")

{¶ 89} Additionally, the Supreme Court of Ohio has commented that "[i]f both parents' incomes are taxed in the same tax bracket, no net savings are realized by allocating the exemption to the noncustodial parent." *Singer v. Dickinson*, 63 Ohio St.3d 408, 416, 588 N.E.2d 806 (1992). That would be true here, where the parties' incomes are nearly equal ($100,000 for Chinequa and $97,000 for Anthony). *See* Child Support Computation Worksheet attached to the Decision, p. 1. Accordingly, the trial court's decision was not an abuse of discretion. The sixth assignment of error is overruled.


VII. Conclusion

{¶ 90} The first assignment of error having been sustained, and the remaining

assignments of error having been overruled, the judgment of the trial court is affirmed in part and reversed in part. This matter will be remanded solely for the trial court to adjust the amount to be paid on the parties' 2019 IRS debt. On remand, the court should add the amount of the income tax debt to the municipal court judgment that was paid and divide this amount as it deems equitable. The court should then credit each party with the amount paid toward his or her share of the total debt and order reimbursement as needed.

. . . . . . . . . . . . .

EPLEY, P.J., and HUFFMAN, J., concur.